

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-18-1995

# Jaguar v Royal Oaks Motor Car

Precedential or Non-Precedential:

Docket 93-5783

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Jaguar v Royal Oaks Motor Car" (1995). *1995 Decisions.* Paper 13.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/13

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————————

NO. 93-5783
—————————————

JAGUAR CARS INC.

v.

ROYAL OAKS MOTOR CAR COMPANY, INC.;
THEODORE J. FORHECZ, SR.;
MARK FORHECZ;
THEODORE J. FORHECZ, JR.;
RICHARD KIRSH; JACK RUSHER;
EDWARD ZELLER

Mark M. Forhecz, Appellant

—————————————

No. 93-5784
—————————————

JAGUAR CARS INC.

v.

ROYAL OAKS MOTOR CAR COMPANY, INC.;
THEODORE J. FORHECZ, SR.;
MARK FORHECZ;
THEODORE J. FORHECZ, JR.;
RICHARD KIRSH; JACK RUSHER;
EDWARD ZELLER

Theodore J. Forhecz, Sr., Appellant
———————————————————————————————————————

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 91-cv-02014)
———————————————————————————————————————

Argued: July 25, 1994

Before:  BECKER, ALITO, Circuit Judges,

and BRODY, <u>District Judge</u>.[*]

(Filed January 18, 1995)

CARL J. CHIAPPA, ESQUIRE (Argued)
Townley & Updike
450 Lexington Avenue
New York, NY 10174

<u>Attorney for Jaguar Cars</u>


GARY R. BATTISTONI, ESQUIRE (Argued)
Drinker, Biddle & Reath
1345 Chestnut Street
Philadelphia National Bank Bldg.
Philadelphia, PA 19107-3496

<u>Attorney for Theodore J. Forhecz, Sr.</u>


MARTIN G. MARGOLIS, ESQUIRE (Argued)
STUART POBERESKIN, ESQUIRE
Margolis, Meshulam & Pobereskin
60 Pompton Avenue
Verona, New Jersey 07044

<u>Attorney for Mark M. Forhecz</u>

---

OPINION OF THE COURT

---

BECKER, <u>Circuit Judge</u>.

This appeal arises out of a civil RICO action, 18 U.S.C.A. § 1951 et. seq. (1984), brought by plaintiff, Jaguar Cars, Inc. ("Jaguar"), against Theodore Forhecz, Sr., and his sons Theodore Forhecz, Jr. and Mark Forhecz, alleging that they

---

[*]. Honorable Anita B. Brody, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

had perpetrated a scheme to systematically submit fraudulent warranty claims to Jaguar through their jointly owned Jaguar dealership, Royal Oaks Motor Car Company, Inc. ("Royal Oaks") in violation of RICO sections 1962(c) and (d). A jury awarded Jaguar damages of $1.1 million against Theodore Forhecz, Sr. ("Theodore, Sr.") and $900,000 against Mark Forhecz ("Mark").[1] In its final judgment, the district court molded the verdict to reflect treble damages for the RICO violations, as required by 18 U.S.C.A. § 1964(c) (1984).

Theodore, Sr. contends that the evidence was legally insufficient to find him liable of the RICO predicate acts of aiding and abetting mail fraud. Additionally, Theodore, Sr. and Mark ("the defendants") contend that Jaguar's RICO claims were legally insufficient because Jaguar failed to establish sufficient distinctiveness between the defendant "persons," allegedly liable for the RICO violations, and the "enterprise" through which those persons acted. This latter contention requires us to reconsider our interpretation of the civil RICO statute in light of evolving Supreme Court precedent. More particularly, we are faced with the question whether this court's jurisprudence concerning the distinctiveness requirement of 18 U.S.C.A. § 1962(c) (1988), see Glessner v. Kenny, 952 F.2d 702, 710 (3d Cir. 1991), survived the Supreme Court's opinions in

---

[1]. Theodore Forhecz, Jr. was in charge of sales and reported to his brother Mark. Theodore, Jr. was absolved of RICO violations by the district court and is not a party to this appeal.

Reves v. Ernst & Young, 113 S.Ct. 1163 (1993) and National Organization for Women v. Scheidler, 114 S.Ct. 798 (1994).

Because we decide that this court's application of the distinctiveness requirement of § 1962(c) to corporate officers and directors does not survive Reves and Scheidler, and because we are, therefore, satisfied that corporate officers/employees, such as the defendants, may properly be held liable as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity, we will affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Theodore, Sr. was the 51% owner and president of the Royal Oaks dealership.  The remaining 49% of the dealership was owned by Mark and Theodore, Jr.  Mark was the general manager of Royal Oaks and ran the day-to-day operations of the dealership. In managing Royal Oaks, Mark reported to his father, who was the president and majority shareholder.  Theodore, Sr. was actively involved in the operation of the dealership, earning a salary of roughly one-half million dollars a year for his services. Theodore, Sr. spent between twenty-five and thirty hours a week at Royal Oaks and met with Mark on a daily basis to discuss the dealership's operations.

The trial record demonstrated that the Royal Oaks dealership, through the actions of its employees, perpetrated a widespread scheme from as early as 1987 through May 1991 to defraud Jaguar through the submission of thousands of fraudulent warranty claims.  Under this scheme, warranty claims were continuously submitted to Jaguar for the cost of labor and parts

for alleged repairs that were either unnecessary, were never actually performed, or were performed on cars that were no longer under warranty. The scheme included submitting fictitious time-sheets, doctoring the warranty paperwork submitted to Jaguar, and altering new parts to make them look old and in need of replacement. Additionally, an outside sublet paint-and-body shop, Kolorworks, and its owner, Linda Kucharski, assisted the defendants by helping them construct fraudulent warranty claims for Royal Oaks to submit to Jaguar.

In total, Royal Oaks defrauded Jaguar in an amount of between one and two million dollars,[2] enabling Royal Oaks to generate hundreds of thousands of dollars of warranty income per month and to maintain extremely lucrative salaries for the defendants through periods of declining sales income even though its work bays were often empty and its technicians idle. The

---

[2]. The one to two million dollar estimate comes from testimony that between 30% and 60% of the warranty repairs at the dealership were fraudulent, combined with evidence that during this period Jaguar paid a total of $3,487,080 to Royal Oaks for warranty claims. We reject defendants' contention on appeal that this evidence was too uncertain and speculative to support the jury's verdict of $1.1 million against Theodore, Sr. and $900,000 against Mark. Jaguar's inability to give exact data on the fraud was due to the defendants' secretive scheme in which the paperwork for legitimate and fraudulent transactions was identical. It is well settled that in such circumstances "the jury may make a just and reasonable estimate of the damage based on relevant data." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580 (1946); see also Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 206, 213 (3d Cir. 1983) ("[P]laintiffs must be free to select their own damage theories as long as they are supported by a reasonable foundation."). Given the evidence presented by Jaguar, we conclude that the jury had a reasonable foundation on which to base its verdict.

evidence presented at trial demonstrated that actual work had declined to a point where there were few, if any, cars in the service department.

Correspondingly, in order to occupy their time, the dealership's ten service technicians regularly sat at their workbenches reading magazines, or congregated to pitch coins, play ping-pong, softball, or operate electronic cars.

In October 1990, Jaguar began to suspect fraud at Royal Oaks and, in an unprecedented move, sent a team of officials into the dealership for an entire week to watch every repair being made. In order to avoid detection, the defendants placed a load of new cars in the service areas for mock repairs, so that the area looked full and technicians were kept busy while Jaguar's representatives were at the dealership. Such actions along with other modifications and refinements to the fraudulent scheme allowed the fraud to continue until May of 1991.

After discovering the fraud and terminating the dealership in May of 1991, Jaguar brought suit in the District Court for the District of New Jersey alleging violations of RICO sections 1962(c) and (d). Section 1962(d) prohibits conspiring to violate sub-section (c). 18 U.S.C.A. § 1962(d) (West Supp. 1994). Accordingly, the viability of Jaguar's section (d) claim depends on the legal sufficiency of its § 1962(c) claim.

As noted above, the jury awarded damages against Theodore, Sr. and Mark on Jaguar's RICO claims. The district court upheld the jury's award in response to the defendants' post-trial motions for judgment as a matter of law under Fed R.

Civ. Proc. 50(a) or for a new trial under Fed. R. Civ. Proc. 59. This appeal from the judgment and from the district court's order denying the defendants' post-trial motions followed.

## II.

The defendants contend that Jaguar's RICO claims were legally insufficient in that Jaguar failed to allege a violation of § 1962(c) by "persons" operating or managing a distinct "enterprise." Since this is a question of law, we exercise plenary review. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Section 1962(c) provides, in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

18 U.S.C.A. § 1962(c) (1984).

It is uncontested, on appeal, that Royal Oaks conducted "a pattern of racketeering activity" which affected interstate commerce. Given that § 1962(c) requires conduct by a "person employed by or associated with any enterprise," the issue is whether Jaguar has alleged activity by both a person and an enterprise. "Person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C.A. § 1961(3) (1984). "Enterprise" includes "any individual, partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C.A. § 1961(4) (1984).

## A.

This court first addressed § 1962(c)'s requirement to plead persons distinct from an enterprise in <u>Hirsch v. Enright Refining Co.</u>, 751 F.2d 628, 633 (3d Cir. 1984).  In <u>Enright</u>, a jewelry manufacturer brought an action alleging fraudulent misrepresentation and a corresponding violation of § 1962(c) against a lone defendant -- a corporation engaged in metal refining.  In <u>Enright</u> we concluded that the defendant corporation could not be liable under § 1962(c) in that "the `person' subject to liability cannot be the same entity as the `enterprise.'"  <u>Id.</u> at 633.  Because the person charged with liability in <u>Enright</u>, the corporate defendant, was "the same entity as the entity fulfilling the enterprise requirement," we reversed the § 1962(c) RICO judgment in favor of the plaintiff.  <u>Id.</u> at 633.

In <u>Enright</u> we articulated two grounds in support of our holding.  The first was a literal reading of the statute: "the language contemplates that the `person' must be associated with a separate `enterprise' before there can be RICO liability on the part of the `person.'"  <u>Id.</u>  The second ground was a belief that Congress intended to limit RICO's application to preventing the infiltration of legitimate organizations by criminal and corrupt organizations: "[i]t is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be

an innocent victim of the racketeering activity in some circumstances." Id.

In Sedima v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275 (1985), the Supreme Court foreclosed Enright's second rationale.

> Instead of being used against mobsters and organized criminals, [RICO] has become a tool for everyday fraud cases brought against respected and legitimate enterprises. Yet Congress wanted to reach both legitimate and illegitimate enterprises. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that [RICO] is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. . . . The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth. It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. Yet this defect -- if defect it is -- is inherent in the statute as written, and its correction must lie with Congress.

Id. at 499, 105 S.Ct. at 3286 (citation, internal quotation marks and footnote omitted). Thus, the Court's holding in Sedima undermined the second basis of the Enright holding.

This court, nonetheless, properly continued after Sedima to apply a distinctiveness requirement, since Enright's holding was also based on § 1962(c)'s textual directive to allege conduct by defendant "persons" operating an "enterprise." Thus, Enright's basic holding that "the `person' subject to liability cannot be the same entity as the `enterprise,'" Enright, 751 F.2d

at 633, plainly survived Sedima.  See Glessner, 952 F.2d at 710 ("The requirement of distinctiveness stems from the statute itself, and has been applied following Sedima.");  Brittingham v. Mobil Corp., 943 F.2d 297, 300 (3d Cir. 1991) ("[T]he plain language of the statute provides that the person must be `employed by or associated with' -- and therefore separate from -- the enterprise . . . .");  Petro-Tech, Inc. v. Western Co., 824 F.2d 1349, 1359 (3d Cir. 1987) ("We explained in Enright that § 1962(c) was drafted in such a way that Congress must have intended the `person' and the `enterprise' to be distinct entities under that provision.").

This court's post-Sedima jurisprudence, however, could be described as following an oblique angle, which, with the benefit of hindsight, appears unfortunate.  In defining the scope of the distinctiveness requirement, our cases focused not on the statutory rationale, but on a re-incarnation of the defunct infiltrating racketeer rationale of Enright.  Since, under the infiltrating racketeer rationale, legitimate corporations were properly viewed as victims of the racketeering activity, we reasoned that defendant persons needed to be associated with another separate, illegitimate infiltrating enterprise.  In other words, we concluded that a successful § 1962(c) claim could not allege conduct on the part of corporate officers and directors acting through a legitimate corporate enterprise.  This limitation on actions under § 1962(c) was born of a pre-Sedima "infiltrating racketeer" reading of RICO's legislative history, which, as explained below, was clearly emasculated by the Supreme

Court in Reves and Scheidler. Clear resolution of the issues requires, however, that we briefly sketch our post-Sedima jurisprudence.[3]

This jurisprudence began to diverge in Petro-Tech, Inc. v. Western Co., 824 F.2d at 1359, where, relying on the infiltrating racketeer legislative history cited in Enright, we held that "§ 1962(c) was intended to govern only those instances in which an `innocent' or `passive' corporation is victimized by the RICO `persons,' and either drained of its own money or used as a passive tool to extract money from third parties." After Petro-Tech, we continued to adhere to this limitation on § 1962(c) claims.

In Glessner v. Kenny, 952 F.2d at 710-14, we considered whether "the individual defendants who were officers and employees of the corporation[] can be the `persons' who were conducting a pattern of racketeering through the corporation[] as an enterprise." Id. at 713. Glessner involved a suit by defrauded customers against the defendants, William Kenney, and the other officers of Meenan Oil Co. ("Meenan"), who allegedly acted through the corporation to fraudulently market and sell residential home heating systems. Glessner upheld the district

_____

[3]. Although Reves and Scheidler did not explicitly address § 1962(c)'s distinctiveness requirement, we nevertheless conclude, see infra part D, that these cases by implication emasculated our distinctiveness jurisprudence. Given this conclusion, we believe it is necessary to first discuss and interpret this court's relevant post-Sedima jurisprudence in order to effectively demonstrate how the analysis of Reves and Scheidler implicitly overruled this court's interpretation of § 1962(c)'s distinctiveness requirement.

court's dismissal of plaintiffs' § 1962(c) claim for failure to plead persons distinct from the corporate enterprise. The Glessner panel acknowledged that in certain instances officers and employees could constitute persons conducting a pattern of racketeering activity through a corporate enterprise (though it did not expand upon this statement). Glessner, 952 F.2d at 713. Nevertheless, the panel dismissed the action on the authority of the Petro-Tech limitation of § 1962(c) claims to "only those instances in which an `innocent' or `passive' corporation is victimized by the RICO `persons,' and either drained of its own money or used as a passive tool to extract money from third parties." Glessner, 952 F.2d at 713.

In concluding that plaintiffs failed to overcome this limitation, the Glessner panel stated:

> [T]he plaintiffs' injuries for which suit was brought arose out of their failure to obtain the safe, state-of-the-art [home heating] units for which they paid. The individual defendants were alleged to have participated in the fraudulent advertising as agents of the corporation. The RICO case statement alleges merely that "all of the defendants held positions as officers and principals of the corporate defendants, and received income as such. All of the defendants derived income from each and every sale of the [home heating] products. These sales were generated by defendants' multiple mail fraud violations which combined into a pattern of racketeering." This activity is indistinguishable from that alleged as to the corporations and is a far cry from the use by individuals of an innocent passive corporation contemplated by Petro-Tech. We conclude therefore that this is not the situation in which individual defendants, whether employees/officers or not, can be viewed as distinct from the corporations

> deemed the enterprise. It follows that dismissal of the section 1962(c) claim was not erroneous.

Id. at 713-14 (citations and internal quotation marks omitted). Thus, the Glessner panel, relying in turn on Petro-Tech's infiltrating racketeer limitation to § 1962(c) actions, dismissed the plaintiffs' claim that the defendant persons conducted the corporate enterprise through a pattern of racketeering activity.

**B.**

Under this court's interpretation of § 1962(c), as articulated in Glessner, Jaguar's RICO claims would fail unless Royal Oaks was either (1) the victim of the defendant's scheme, or (2) a passive tool through which the scheme was conducted. Pointing to the Glessner panel's acknowledgement that officers and employees of a corporate enterprise could in certain instances be properly viewed as distinct defendant "persons" under this test, Jaguar initially contends that this is such a case and, accordingly, is distinguishable from Glessner.

We begin by observing that it seems inconceivable that Royal Oaks could be viewed as the victim of the defendants' racketeering activity, since Jaguar alleges that Royal Oaks is the enterprise through which the defendants conducted their racketeering activity. Rather, Jaguar contends that its claim is distinguishable from Glessner in that the defendants in this action can be viewed as persons using Royal Oaks as a passive tool to extract money from third parties.

In determining the scope of the "passive tool" limitation, we begin by recognizing that in Glessner, the court concluded that the plaintiffs had failed to allege that the defendant officers were using Meenan as a passive tool to extract money from third parties. The Glessner panel reached this conclusion despite the fact that the plaintiffs had alleged that the defendants had operated the Meenan corporation so as to derive income from multiple mail fraud violations. Bound by the strictures of Petro-Tech, the Glessner panel reasoned that the defendants' activities were "a far cry from the use by individuals of an innocent passive corporation contemplated by Petro-Tech." Glessner, 952 F.2d at 714. Given this conclusion, and recognizing that the activity contemplated by Petro-Tech was rooted in Enright's infiltrating racketeer approach, we conclude that this court's current interpretation of § 1962(c) improperly limits its application to those circumstances where infiltrating racketeers have successfully positioned themselves as employees and/or officers within an otherwise legitimate corporate enterprise.

Our interpretation of this court's "passive instrument" limitation is buttressed by the recognition that corporations are by definition passive instruments, since they are artificially created legal persons that can only act through their officers and employees. Thus, a test that examines whether a corporation is "a passive tool to extract money from third parties" can be useful in determining whether officers and employees are

sufficiently distinct from the corporation only if one adopts the infiltrating-racketeer rationale.

In sum, we find Jaguar's contention that this case, unlike Glessner, satisfies our case law's interpretation of § 1962(c)'s distinctiveness requirement unpersuasive. In this action, as in Glessner, the plaintiffs have alleged that the defendant "persons" operated, as officers and employees, a corporate "enterprise" through a pattern of racketeering activity. Similarly, like Glessner, the defendants here are not distinct, infiltrating racketeers operating a legitimate corporate enterprise as an innocent passive tool; rather, they are officers and employees actively managing the affairs of an otherwise legitimate corporation through a pattern of racketeering activity.

## C.

Even though we conclude that this case is indistinguishable from Glessner, we nevertheless hold that the defendants here are liable under § 1962(c) as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity, since this court's application of the distinctiveness requirement to shield corporate officers and directors from § 1962(c) liability does not survive Reves, 113 S.Ct. at 1163 and Scheidler, 114 S.Ct at 798.

In Reves, the Supreme Court was faced with the question whether § 1962(c) "persons" must participate in the "operation or management" of the "enterprise" in order to be subject to liability. The case involved a § 1962(c) action against auditors

working for what was then the accounting firm of Arthur Young, which was engaged in an audit of the Farmer's Cooperative of Arkansas and Oklahoma ("the Co-op").  Reves, 113 S.Ct. at 1167. In certifying the Co-op's annual financial statements on two separate occasions, the auditors knowingly failed to reflect a Co-op investment at fair market value.  Id. at 1167-68.  Such a valuation would have resulted in the financial statements properly reflecting the Co-op's insolvency.  Id.

Given this malfeasance, the Co-op's trustee in bankruptcy brought state and federal securities fraud claims along with a RICO claim under § 1962(c) on behalf of a certified class of noteholders.  Id.  The trustee alleged that the auditors were the "persons" who conducted or participated in a corporate "enterprise" (the Co-op) through a pattern of racketeering activity consisting of the Co-op's fraudulent sale of securities with the aid of knowingly false financial statements.  While the auditors were found liable to the noteholders for their securities fraud claims,[4] the Court faced the question whether they were also liable under § 1962(c) (that is, whether the auditors were persons conducting or participating in the conduct of the Co-op's affairs, given that the Co-op was the alleged "enterprise" under § 1962(c)).  Id. at 1169.

---

[4].  The auditors federal security fraud liability had been upheld by a previous Supreme Court opinion, addressing the question of whether the Co-op's notes were securities within the meaning of § 3(a)(10) of the Securities and Exchange Act of 1934.  Reves v. Ernst & Young, 494 U.S. 56, 110 S.Ct. 945 (1990).

The Court held that liability under § 1962(c) is limited to those who "participate in the operation or management of the enterprise itself." Id. at 1173. Since the auditors were independent and did not operate or manage the Co-op, the Court ruled that they were not liable under § 1962(c).[5] In so holding, the Court undermined the use of § 1962(c) to hold liable "`outsiders' who have no official position within the enterprise." Id. Reading RICO's legislative history, the Court stated that subsections (a) and (b) of § 1962 addressed Congressional concern with the infiltration of legitimate organization by racketeers, while in contrast "§ 1962(c) is limited to persons `employed by or associated with' an enterprise, suggesting a more limited reach than subsections (a)

---

[5]. Commentators have observed that the plaintiffs in Reves could possibly have satisfied the operation and management requirement of § 1962(c) had they alleged the existence of another enterprise.

> In Reves the enterprise was the Co-op, but this is not the only possibility. Section 1962(4) defines enterprise as including any "legal entity" . . . and "any union or group of individuals associated in fact although not a legal entity." . . . Thus, RICO's enterprise requirement can be satisfied by "a group of individuals associated in fact" even though not a distinct "legal entity." What if plaintiff in Reves had alleged that an association in fact consisting of Arthur Young, Jack White [the Co-op's General Manager], and the Co-op constituted the racketeering enterprise, and that Arthur Young directed the affairs of this "enterprise?"

See Daniel B. Fischel & Alan O. Sykes, Civil Rico after Reves: An Economic Commentary, 1993 SUP. CT. REV. 193-94 (footnote omitted).

and (b)."  Id.  (emphasis added); see also id. ("Of course,
`outsiders' may be liable under § 1962(c) if they are `associated
with' an enterprise and participate in the conduct of its affairs
-- that is participate in the operation or management of the
enterprise itself.").

In the wake of Reves, the Supreme Court reiterated its
interpretation of § 1962(c) in National Organization for Women v.
Scheidler, 114 S.Ct. at 798, which concluded that an economic
motive was not required for liability under § 1962(c).  In so
holding, the Court stated:  "By contrast [with subsections (a)
and (b)], the `enterprise' in subsection (c) connotes generally
the vehicle through which the unlawful pattern of racketeering
activity is committed, rather than the victim of that activity."
Id. at 804.  In light of Reves and Scheidler, we must, as Jaguar
has requested, re-evaluate the liability under § 1962(c) of
officers and employees acting through a corporate enterprise.[6]

---

[6]. We recognize that in Gasoline Sales v. Aero Oil Co., 1994
U.S. App. LEXIS 30399 (3d Cir. November 1, 1994), this court
continued to apply Glessner's limitation on § 1962(c) actions
against officers and directors acting through a corporate
"enterprise."  In Gasoline Sales, plaintiffs alleged, in part,
that Getty Petroleum Corp. ("Getty") and its wholly-owned
subsidiaries engaged in a widespread fraudulent scheme to defraud
retail gasoline stations.  One of the plaintiff's claims in
Gasoline Sales was against Getty's corporate officers, alleging
that they operated and managed Getty as an enterprise through a
pattern of racketeering activity.  Relying on Glessner, the
Gasoline Sales panel upheld the dismissal of this claim,

> We have held that corporate employees who
> victimize their employer by draining it of
> its own money or using it as a passive tool
> to extract money from third parties are
> proper section 1962(c) defendants.  Glessner,
> 952 F.2d at 713. Where the employees merely

D.

Our case law heretofore has focused on the degree of distinctiveness between the defendant persons and the enterprise. As we have stated, this court has held that in order for liability under § 1962(c) to attach, the corporate enterprise must be either (1) a victim, or (2) a passive tool used to extract money from third parties (as opposed to the enterprise through which the fraudulent scheme was perpetrated). But the first of these two situations -- a corporate "enterprise" as victim of the racketeering activity of the defendant "persons" -- is in direct conflict with both Reves and Scheidler.

In these cases the Supreme Court held that the "enterprise" in subsection (c) is properly viewed as the "vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." Scheidler, 114 S.Ct. at 804; Reves, 113 S.Ct. at 1171 ("Congress

(..continued)
> participate in the corporation's own fraud by acting as corporate agents, however, the employees may not be sued under section 1962(c). Id. at 713-14.

Id. at *7.
Notwithstanding this court's internal operating procedures, see Internal Operating Procedure 9.1 (binding subsequent panels by prior published panel decisions absent in banc consideration), we conclude that the Gasoline Sales panel's application of the Glessner limitation is also not conclusive here because the Supreme Court's opinions in Reves and Scheidler were not called to the panel's attention, and the opinion did not either explicitly or implicitly decide the impact of those cases on the issues raised in that appeal.

consistently referred to subsection (c) as prohibiting the operation of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting the acquisition of an enterprise.").  Consequently, a victim corporation "drained of its own money" by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their racketeering activity.  Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant.

The second of our case law's two situations -- the use of a corporate enterprise by infiltrating racketeers as a passive tool or instrument to extract money from third parties -- remains a proper, but very limited, application of § 1962(c) under Reves. See Fischel & Sykes, supra, at 191 ("Unless the outsid[er] . . . is responsible for or in control of management decision making, enabling it to `direct the enterprise's affairs,' there can be no RICO liability" (quoting Reves, 113 S.Ct. at 1170)).

In Reves, the Court acknowledged that in certain rare instances infiltrating "persons" distinct from the corporate enterprise could satisfy the "operation or management test," if they exerted sufficient control over the corporation's activities.  "`[O]utsiders' may be liable under § 1962(c) if they are `associated with' an enterprise and participate in the conduct of its affairs -- that is, participate in the operation or management of the enterprise itself."  Reves, 113 S.Ct. at

1173 ("An enterprise also might be `operated' or `managed' by others [those not in upper management] `associated with' the enterprise who exert control over it as, for example, by bribery.").

While a § 1962(c) claim can exist against persons distinct from the corporate enterprise, so long as they exert sufficient control over the enterprise, the Court has made clear that the provision's reach is not limited to such rare instances. In Reves the Court examined, and decided, the question whether the defendant auditors "participated in the management of the Co-op." Reves, 113 S.Ct. at 1173. While the majority in Reves found that the auditors had not acted in a management capacity in their preparation of the Co-ops's financial statements, the dissent argued that the auditors "crossed the line separating `outside' auditors from `inside' financial managers."[7] Reves, 113 S.Ct. at 1178 (Souter dissenting). Implicit in the Court's analysis then, was the recognition that "inside" managers are the "persons" § 1962(c) was designed to reach. Thus, Glessner's limitation to "outside" defendants, who either victimize the corporate enterprise or operate it as a passive tool, cannot survive the Court's holding in Reves that "inside" managers are properly liable under § 1962(c).

---

[7]. We note that this court applied Reves in a similar context in affirming the dismissal of a § 1962(c) RICO claim against independent auditors, but without needing to consider its implication on our distinctiveness requirement. See University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1538-39 (3d Cir. 1993).

Finally, we note that, if we fail to overrule this court's interpretation of § 1962(c), its combination with Reves would hold liable only those persons who are sufficiently connected to an enterprise so as to operate or manage it while still remaining sufficiently distinct from the enterprise so as to victimize or passively control it.  Congress could not have intended such a razor thin zone of application.  See Sedima, 473 U.S. at 497-98, 105 S.Ct. at 3285 ("RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach but also of its express admonition that RICO is to `be liberally construed to effectuate its remedial purposes,' Pub. L. 91-452, § 904(a), 84 Stat. 947." (citation omitted)).  As we have stated, our distinctiveness jurisprudence was born of the now defunct, pre-Sedima, infiltrating racketeer reading of RICO's legislative history, and is now even more clearly at odds with Supreme Court precedent as demonstrated by Reves and Scheidler.  This court's interpretation of § 1962(c)'s distinctiveness requirement must therefore be brought in line with binding Supreme Court precedent.

**E.**

We are thus left with the question: what remains of the statutorily-based distinctiveness requirement after Reves and Scheidler?  As we have stated, this requirement originates in the statute's textual directive that § 1962(c) liability requires conduct by defendant "persons" acting through an "enterprise." In this regard, we conclude that the essential holding of Enright remains undisturbed -- a claim simply against one corporation as

both "person" and "enterprise" is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant "persons" acting through a distinct "enterprise." But, alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement. A corporation is an entity legally distinct from its officers or employees, which satisfies the "enterprise" definition of 18 U.S.C.A. § 1961(4). This section provides that "`enterprise' includes any individual, partnership, corporation, association or other legal entity." 18 U.S.C.A. § 1961(4) (emphasis added). Accordingly, Jaguar has satisfied the distinctiveness requirement of § 1962(c). Jaguar has not brought a claim against Royal Oaks, but instead seeks recovery from the defendants, as persons operating and managing the Royal Oaks enterprise through a pattern of racketeering activity.

We recognize that this court has, at times, supported its infiltrating-racketeer reading of subsection (c) by resort to the notion that "[s]uch an interpretation avoids the absurd result that a corporation may always be pled to be the enterprise controlled by its employees or officers." Glessner, 952 F.2d at 713. Informed by the teaching of Reves and Scheidler, however, we do not believe that allowing a § 1962(c) action against officers conducting a pattern of racketeering activity through a corporate enterprise yields an "absurd result." In such an action, the plaintiff can only recover against the defendant officers and cannot recover against the corporation simply by pleading the officers as the persons controlling the corporate

enterprise, since the corporate enterprise is not liable under § 1962(c) in this context. Instead, a corporation would be liable under § 1962(c), only if it engages in racketeering activity as a "person" in another distinct "enterprise," since only "persons" are liable for violating § 1962(c). Petro-Tech, 824 F.2d at 1358.

This interpretation of the distinctiveness requirement of § 1962(c), not only accords with binding Supreme Court precedent, as described above, but also is supported by the interpretation adopted by all other circuits that have addressed the question. In United States v. Robinson, 8 F.3d 398 (7th Cir. 1993), for example, the Seventh Circuit was faced with a set of circumstances similar to those in this case. There, criminal RICO charges were brought under § 1962(c) against the officers and controlling shareholders of Renoja, a corporation that operated as a Wendy's franchise. The defendants engaged in a fraudulent scheme to defraud their franchisor, Wendy's International ("Wendy's"), by misstating the amount of their gross sales in order to avoid paying Wendy's the required royalty percentage. The court, focusing on whether the defendant persons and the corporation were distinct legal entities, rejected the defendants' claim that the government had failed to satisfy the distinctiveness requirement of § 1962(c):

> Robinson was charged with improperly conducting Renoja's activities, not his own activities. Robinson's claim that he and Renoja are inseparable entities is meritless. . . . Renoja was an incorporated business that employed several hundred people and

> filed separate income tax returns. Robinson
> and Renoja were not the same entity.

Robinson, 8 F.3d at 407.

In reaching its conclusion, the Robinson panel relied on an earlier opinion by then Judge Posner in McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985), which held that an unincorporated sole proprietorship was a distinct enterprise from its owner because it employed several individuals.  In McCullough, Judge Posner had recognized that, if the sole proprietor had incorporated his business, the corporation could then properly be treated as an "enterprise" under § 1962(c) even if it employed no one else.  Id. at 144 ("If [a] one-man band incorporates, it gets some legal protections from the corporate form, such as limited liability; and it is just this sort of legal shield for illegal activity that RICO tries to pierce.").  This result followed from the conjunctive definition of "enterprise" which includes both "legal entit[ies] and any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C.A. § 1961(4) (emphasis added).  Thus, Judge Posner concluded, "[t]he only important thing is that it [the enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual."

In accord with Robinson is Sever v. Alaska Pulp Corp., 978 F.2d 1529 (9th Cir. 1992), where the Ninth Circuit considered a § 1962(c) claim by a former timber company employee against the

officers of his former incorporated employer.  The plaintiff
there alleged that the officers, acting through a corporate
enterprise, blacklisted him for giving unfavorable testimony to a
Congressional Subcommittee.  The district court dismissed the
action on the grounds that there was "no distinction between the
officers, agents and employees who operate the corporation and
the corporation itself."  Id. at 1534.  Addressing this argument,
the Ninth Circuit held that a corporation was by legal definition
an enterprise distinct from its officers or employees:

> This decision makes it clear that the
> inability of a corporation to operate except
> through its officers is not an impediment to
> section 1962(c) suits.  That fact poses a
> problem only when the corporation is the
> named defendant – when it is both the
> "person" and the "enterprise." In this case,
> however, [plaintiff] named the several
> individual officers as defendants/persons,
> and [the corporation] as the enterprise.
> Therefore, he has satisfied this allegation
> requirement.

Sever, 978 F.2d at 1534.  Also in accord are Davis v. Mutual Life
Ins. Co., 6 F.3d 367, 377–78 (6th Cir 1993), and Bennett v. Berg,
685 F.2d 1053, 1061 (8th Cir. 1982), aff'd en banc 710 F.2d 1361
(8th Cir.), cert. denied, 464 U.S. 1008 (1983).

In sum, we conclude that when officers and/or employees
operate and manage a legitimate corporation, and use it to
conduct, through interstate commerce, a pattern of racketeering
activity, those defendant persons are properly liable under
§ 1962(c).

**III.**

In addition to challenging the legal sufficiency of his RICO violation based on the distinctiveness requirement, Theodore, Sr. ("Theodore") contends that insufficient evidence was presented at trial to support the jury's finding that he was liable of the predicate acts of mail fraud.[8]  The district court considered this contention and concluded "that a reasonable jury could readily have found liability on the RICO . . .  claims," because "[t]here was sufficient circumstantial evidence to prove Theodore's knowing involvement in the fraudulent management of the Royal Oaks service Department."  Mem. Op. at 3-4.

In reviewing an order denying or granting a judgment as a matter of law, we exercise plenary review, applying the same standard as the district court.  Lightning Lube, 4 F.3d at 1166. That standard permits such a motion to be granted "only if, viewing the evidence in the light most favorable to the non-movant and, giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  Id.  In making such a determination, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  Id.  While a "scintilla of evidence is not enough to sustain a verdict of liability," the

---

[8].  Since Jaguar elected to recover against the defendants based on the RICO claims and because we conclude that Theodore was properly found liable for the RICO violations, we do not reach his contention that the jury's assessment of liability against him for negligently overseeing the dealership and for unjust enrichment was legally insufficient.

question is "whether there is evidence upon which the jury could properly find a verdict for that party." Id. It is uncontroverted that Mark and other dealership employees committed numerous acts of mail fraud by systematically mailing false and fraudulent warranty claims to Jaguar. At issue on appeal is whether the evidence presented to the jury supports the conclusion that Theodore aided and abetted these predicate acts.

We have held that a defendant may be liable under RICO if he aided or abetted the commission of at least two predicate acts of mail fraud. See Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990); Petro-Tech, 824 F.2d at 1356. Civil RICO liability for aiding and abetting advances RICO's goal of permitting recovery from anyone who has committed the predicate offenses, "regardless of how he committed them." Petro-Tech, 824 F.2d at 1357. In order to find a defendant liable for aiding and abetting a predicate act under RICO, the plaintiff must prove (1) that the substantive act has been committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it. Local 560, 780 F.2d at 284. The first element has concededly been met in this case. With regard to the second, a plaintiff need not offer direct evidence of intent. Rather, the fact finder may infer a defendant's knowledge and intent from circumstantial evidence. See Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir. 1991); United States v. Local 560, 780 F.2d 267, 284 ("[I]t has long been settled that it is permissible to infer from circumstantial evidence the existence of intent.").

We must therefore consider whether, giving Jaguar the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find that Theodore knew of the fraud and acted with the intent to facilitate it. We recognize, as Jaguar concedes, that no single piece of evidence links Theodore directly to the fraud. Rather, Jaguar contends that while Mark directed the fraudulent scheme, Theodore's experience and active participation in the Royal Oaks dealership, combined with the extent of the fraud, present a sufficient basis from which a reasonable jury could have concluded that he was aware of and facilitated the fraudulent scheme. We agree.

Theodore was the 51% owner and active president of the Royal Oaks Jaguar dealership. While Theodore had been a car dealer since 1956, his son Mark had relatively little experience in operating a dealership. Theodore was actively involved in the operation of Royal Oaks. He spent roughly twenty-five to thirty hours a week at the dealership and had ultimate supervisory responsibility for the dealership's operations. Theodore was Mark's supervisor, and met with him daily to discuss the operation of the dealership, including its parts and service department. In order to have exculpated Theodore, the jury would had to have believed that in those meetings they never discussed, in any depth, the operation of the service department and the source of that department's income; even though, during this period, the service department was accounting for between $200,000 and $400,000 of the dealership's monthly income, thereby

allowing Theodore to maintain his annual salary of one-half million dollars.

In our view, the evidence supports the conclusion that Theodore was aware of and concerned about all of the operations of the dealership. His salary was five times the amount of any other employee, including Mark. Theodore acknowledged in his testimony that he reviewed the dealership's financial statements on a monthly basis and spent "a lot" of time "inspecting and looking around the building."

Royal Oaks generated hundreds of thousands of dollars a month in warranty claims, while actual work had declined to a point where there were few, if any cars in the service department. The evidence presented at trial demonstrated that the dealership's ten service technicians, in order to occupy their time, regularly sat at their workbenches reading magazines, or congregated to pitch coins, play ping-pong, play softball, or operate electronic cars. Similarly, some technicians themselves asked to be laid off because they didn't believe that there was enough work to keep them busy. In a dealership which employed a total of roughly thirty-five people, a jury could reasonably have found it likely that Theodore was aware of a fraudulent scheme so pervasive that the evidence suggested it was the subject of innumerable jokes among Royal Oaks' employees.

The jury could also reasonably have concluded that an experienced dealer, such as Theodore, would have grown suspicious of the excessive amount of service income attributable to warranty work, when examining the dealership's financial

statements.  Because of the pervasive warranty fraud, Royal Oaks had an unusually high percentage of service department income attributable to warranty work, as opposed to customer-paid repairs.  Given Theodore's monthly scrutiny of the dealership's financial statements, the jury could have concluded he was aware of and facilitated the source of this aberrant financial data.

In addition, Theodore was aware of Jaguar's unprecedented week long monitoring of Royal Oaks' service department, and in response called Jaguar regarding it.  The jury could reasonably have found it inconceivable that Theodore was not aware of and did not facilitate the rampant fraud which both preceded and followed Jaguar's investigation.

In sum, we conclude that the evidence of Theodore's control over the dealership (including his spending significant time there, reviewing the financial statements, and discussing the dealership's operations on a daily basis with his son, the architect of the fraudulent scheme), combined with evidence of the pervasive nature of the fraudulent scheme, allowed the jury to reasonably find Theodore liable of aiding and abetting the predicate acts of mail fraud.

For the foregoing reasons, the judgment of the district court and its order denying the defendants' post-trial motions will be affirmed.[9]

---

[9].  We have considered and rejected, either on the merits or as not relevant, all the remaining arguments raised in the defendants' brief.  Specifically, we note our rejection of the defendants' contention that the district court abused its discretion by refusing to delay the trial in order to permit the testimony of an expert witness not listed in the pretrial order.

(..continued)
The witness was supposed to testify that Royal Oaks' customers were satisfied with the service provided by the dealership.  This testimony is irrelevant to the allegation that Royal Oaks submitted false warranty claims to Jaguar, and hence we agree with the district court's ruling.