## NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL. *v.* SCHEIDLER ET AL.

No. 92–780.   Argued December 8, 1993—Decided January 24, 1994

250

Rehnquist, C. J., delivered the opinion for a unanimous Court. Sou-
ter, J., filed a concurring opinion, in which Kennedy, J., joined, *post*,
p. 263.

*Fay Clayton* argued the cause for petitioners. With her on the briefs were *Susan Valentine, Lowell E. Sachnoff, Jack L. Block, Judi A. Lamble, Alan M. Pollack,* and *Mitchell G. Mandell.*

*Miguel A. Estrada* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Bryson,* and *Cynthia A. Young.*

*G. Robert Blakey* argued the cause for respondents. *Clark D. Forsythe* and *Thomas Brejcha* filed a brief for respondent Scheidler et al. *Jay Alan Sekulow, Walter M. Weber, Keith A. Fournier,* and *Vincent P. McCarthy* filed a brief for respondent Terry et al. *Craig L. Parshall, John W. Whitehead,* and *Alexis I. Crow* filed a brief for respondent Migliorino (Miller). *Paul Benjamin Linton* filed a brief for respondent Murphy.*

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *Jerry Boone,* Solicitor General, and *Sanford M. Cohen,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Roland W. Burris* of Illinois, *Michael F. Easley* of North Carolina, *Stephen D. Rosenthal* of Virginia, *Hubert H. Humphrey III* of Minnesota, and *Lee Fisher* of Ohio; for the American Medical Association et al. by *Jack R. Bierig, Carter G. Phillips, Kirk B. Johnson,* and *Ann E. Allen;* for the National Abortion Federation et al. by *Elaine Metlin, Eve W. Paul,* and *Roger K. Evans;* for the National Network of Abortion Funds by *Kathryn Kolbert;* and for the NOW Legal Defense and Education Fund et al. by *David I. Goldblatt, Charles S. Sims, Deborah A. Ellis,* and *Burt Neuborne.*

Briefs of *amici curiae* urging affirmance were filed for People for the Ethical Treatment of Animals, Inc., et al. by *Edward McGlynn Gaffney, Jr., David Goldberger,* and *Victor G. Rosenblum;* for the Ohio Right to Life Society, Inc., et al. by *David F. Forte;* and for the Southern Center for Law & Ethics et al. by *Albert L. Jordan, Steven T. McFarland,* and *Bradley P. Jacob.*

Briefs of *amici curiae* were filed for the American Civil Liberties Union by *Louis M. Bograd* and *Steven R. Shapiro;* and for Focus on the Family by *Stephen W. Reed* and *Ronald E. McKinstry.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We are required once again to interpret the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) chapter of the Organized Crime Control Act of 1970 (OCCA), Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1988 ed. and Supp. IV). Section 1962(c) prohibits any person associated with an enterprise from conducting its affairs through a pattern of racketeering activity. We granted certiorari to determine whether RICO requires proof that either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose. We hold that RICO requires no such economic motive.

I

Petitioner National Organization for Women, Inc. (NOW), is a national nonprofit organization that supports the legal availability of abortion; petitioners Delaware Women's Health Organization, Inc. (DWHO), and Summit Women's Health Organization, Inc. (SWHO), are health care centers that perform abortions and other medical procedures. Respondents are a coalition of antiabortion groups called the Pro-Life Action Network (PLAN), Joseph Scheidler and other individuals and organizations that oppose legal abortion, and a medical laboratory that formerly provided services to the two petitioner health care centers.[1]

Petitioners sued respondents in the United States District Court for the Northern District of Illinois, alleging violations of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.*, and RICO's §§ 1962(a), (c), and (d), as well as several pendent state-law claims stemming from the activ-

---

[1] The other respondents named in the complaint include the following: John Patrick Ryan, Randall A. Terry, Andrew Scholberg, Conrad Wojnar, Timothy Murphy, Monica Migliorino, Vital-Med Laboratories, Inc., Pro-Life Action League, Inc. (PLAL), Pro-Life Direct Action League, Inc. (PDAL), Operation Rescue, and Project Life.

ities of antiabortion protesters at the clinics. According to respondent Scheidler's congressional testimony, these protesters aim to shut down the clinics and persuade women not to have abortions. See, e. g., Abortion Clinic Violence, Oversight Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 99th Cong., 1st and 2d Sess., 55 (1987) (statement of Joseph M. Scheidler, Executive Director, Pro-Life Action League). Petitioners sought injunctive relief, along with treble damages, costs, and attorney's fees. They later amended their complaint, and pursuant to local rules, filed a "RICO Case Statement" that further detailed the enterprise, the pattern of racketeering, the victims of the racketeering activity, and the participants involved.

The amended complaint alleged that respondents were members of a nationwide conspiracy to shut down abortion clinics through a pattern of racketeering activity including extortion in violation of the Hobbs Act, 18 U. S. C. § 1951.[2] Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Petitioners alleged that respondents conspired to use threatened or actual force, violence, or fear to induce clinic employees, doctors, and patients to give up their jobs, give up their economic right to practice medicine, and give up their right to obtain medical services at the clinics. App. 66, Second Amended Complaint ¶ 97. Petitioners claimed that this conspiracy "has injured

---

[2] The Hobbs Act, 18 U. S. C. § 1951(a), provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Respondents contend that petitioners are unable to show that their actions violated the Hobbs Act. We do not reach that issue and express no opinion upon it.

the business and/or property interests of the [petitioners]."
*Id.*, at 72, ¶ 104. According to the amended complaint,
PLAN constitutes the alleged racketeering "enterprise" for
purposes of § 1962(c). *Id.*, at 72–73, ¶¶ 107–109.

The District Court dismissed the case pursuant to Federal
Rule of Civil Procedure 12(b)(6). Citing *Eastern Railroad
Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365
U. S. 127 (1961), it held that since the activities alleged "in-
volve[d] political opponents, not commercial competitors, and
political objectives, not marketplace goals," the Sherman Act
did not apply. 765 F. Supp. 937, 941 (ND Ill. 1991). It dis-
missed petitioners' RICO claims under § 1962(a) because the
"income" alleged by petitioners consisted of voluntary dona-
tions from persons opposed to abortion which "in no way
were derived from the pattern of racketeering alleged in the
complaint." *Ibid.* The District Court then concluded that
petitioners failed to state a claim under § 1962(c) since "an
economic motive requirement exists to the extent that some
profit-generating purpose must be alleged in order to state a
RICO claim." *Id.*, at 943. Finally, it dismissed petitioners'
RICO conspiracy claim under § 1962(d) since petitioners'
other RICO claims could not stand.

The Court of Appeals affirmed. 968 F. 2d 612 (CA7 1992).
As to the RICO counts, it agreed with the District Court
that the voluntary contributions received by respondents did
not constitute income derived from racketeering activities
for purposes of § 1962(a). *Id.*, at 625. It adopted the analy-
sis of the Court of Appeals for the Second Circuit in *United
States* v. *Ivic*, 700 F. 2d 51 (1983), which found an "economic
motive" requirement implicit in the "enterprise" element of
the offense. The Court of Appeals determined that "non-
economic crimes committed in furtherance of non-economic
motives are not within the ambit of RICO." 968 F. 2d, at
629. Consequently, petitioners failed to state a claim under
§ 1962(c). The Court of Appeals also affirmed dismissal of
the RICO conspiracy claim under § 1962(d).

We granted certiorari, 508 U. S. 971 (1993), to resolve a conflict among the Courts of Appeals on the putative economic motive requirement of 18 U. S. C. §§ 1962(c) and (d). Compare *United States* v. *Ivic, supra,* and *United States* v. *Flynn,* 852 F. 2d 1045, 1052 (CA8), ("For purposes of RICO, an enterprise must be directed toward an economic goal"), cert. denied, 488 U. S. 974 (1988), with *Northeast Women's Center, Inc.* v. *McMonagle,* 868 F. 2d 1342 (CA3) (because the predicate offense does not require economic motive, RICO requires no additional economic motive), cert. denied, 493 U. S. 901 (1989).

## II

We first address the threshold question raised by respondents whether petitioners have standing to bring their claim. Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation. *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 546–547 (1986). Respondents are correct that only DWHO and SWHO, and not NOW, have sued under RICO.[3] Despite the fact that the clinics attempted to bring the RICO claim as class actions, DWHO and SWHO must themselves have standing. *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 40, n. 20 (1976), citing *Warth* v. *Seldin,* 422 U. S. 490, 502 (1975). Respondents are wrong, however, in asserting that the complaint alleges no "injury" to DWHO and SWHO "fairly traceable to the defendant's allegedly unlawful conduct." *Allen* v. *Wright,* 468 U. S. 737, 751 (1984).

---

[3] NOW sought class certification for itself, its women members who use or may use the targeted health centers, and other women who use or may use the services of such centers. The District Court did not certify the class, apparently deferring its ruling until resolution of the motions to dismiss. All pending motions were dismissed as moot when the court granted respondents' motion to dismiss. 765 F. Supp. 937, 945 (ND Ill. 1991).

We have held that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992) (citations omitted). The District Court dismissed petitioners' claim at the pleading stage pursuant to Federal Rule of Civil Procedure 12(b)(6), so their complaint must be sustained if relief could be granted "under any set of facts that could be proved consistent with the allegations." *Hishon* v. *King & Spalding*, 467 U. S. 69, 73 (1984). DWHO and SWHO alleged in their complaint that respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. App. 66, Second Amended Complaint ¶ 97. Petitioners claimed that this conspiracy "has injured the business and/or property interests of the [petitioners]." *Id.*, at 72, ¶ 104. In addition, petitioners claimed that respondent Scheidler threatened DWHO's clinic administrator with reprisals if she refused to quit her job at the clinic. *Id.*, at 68, ¶ 98(g). Paragraphs 106 and 110 of petitioners' complaint incorporate these allegations into the § 1962(c) claim. *Id.*, at 72, 73. Nothing more is needed to confer standing on DWHO and SWHO at the pleading stage.

## III

We turn to the question whether the racketeering enterprise or the racketeering predicate acts must be accompanied by an underlying economic motive. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1961(1) defines "pattern of racketeering activity" to include conduct that is "chargeable"

or "indictable" under a host of state and federal laws.[4] RICO broadly defines "enterprise" in §1961(4) to "includ[e] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Nowhere in either §1962(c) or the RICO definitions in §1961 is there any indication that an economic motive is required.

The phrase "any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" comes the closest of any language in subsection (c) to suggesting a need for an economic motive. Arguably an enterprise engaged in

---

[4] Section 1961(1) provides: "'racketeering activity' means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States . . . ."

interstate or foreign commerce would have a profit-seeking motive, but the language in § 1962(c) does not stop there; it includes enterprises whose activities "affect" interstate or foreign commerce. Webster's Third New International Dictionary 35 (1969) defines "affect" as "to have a detrimental influence on—used especially in the phrase *affecting commerce.*" An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives.

The Court of Appeals thought that the use of the term "enterprise" in §§ 1962(a) and (b), where it is arguably more tied in with economic motivation, should be applied to restrict the breadth of use of that term in § 1962(c). 968 F. 2d, at 629. Respondents agree and point to our comment in *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 489 (1985), regarding the term "violation," that "[w]e should not lightly infer that Congress intended the term [violation] to have wholly different meanings in neighboring subsections."

We do not believe that the usage of the term "enterprise" in subsections (a) and (b) leads to the inference that an economic motive is required in subsection (c). The term "enterprise" in subsections (a) and (b) plays a different role in the structure of those subsections than it does in subsection (c). Section 1962(a) provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Correspondingly, § 1962(b) states that it "shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign com-

merce." The "enterprise" referred to in subsections (a) and (b) is thus something acquired through the use of illegal activities or by money obtained from illegal activities. The enterprise in these subsections is the victim of unlawful activity and may very well be a "profit-seeking" entity that represents a property interest and may be acquired. But the statutory language in subsections (a) and (b) does not mandate that the enterprise be a "profit-seeking" entity; it simply requires that the enterprise be an entity that was acquired through illegal activity or the money generated from illegal activity.

By contrast, the "enterprise" in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity. Subsection (c) makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." Consequently, since the enterprise in subsection (c) is not being acquired, it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity.[5] Nothing in subsections (a) and (b) directs us to a contrary conclusion.

The Court of Appeals also relied on the reasoning of *United States* v. *Bagaric*, 706 F. 2d 42 (CA2), cert. denied, 464 U. S. 840 (1983), to support its conclusion that subsection (c) requires an economic motive. In upholding the convictions, under RICO, of members of a political terrorist group, the *Bagaric* court relied in part on the congressional statement of findings which prefaces RICO and refers to the activities of groups that " 'drai[n] billions of dollars from Ameri-

---

[5] One commentator uses the terms "prize," "instrument," "victim," and "perpetrator" to describe the four separate roles the enterprise may play in § 1962. See Blakey, The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 307–325 (1982).

ca's economy by unlawful conduct and the illegal use of force, fraud, and corruption.'" 706 F. 2d, at 57, n. 13 (quoting OCCA, 84 Stat. 922). The Court of Appeals for the Second Circuit decided that the sort of activity thus condemned required an economic motive.

We do not think this is so. Respondents and the two Courts of Appeals, we think, overlook the fact that predicate acts, such as the alleged extortion, may not benefit the protesters financially but still may drain money from the economy by harming businesses such as the clinics which are petitioners in this case.

We also think that the quoted statement of congressional findings is a rather thin reed upon which to base a requirement of economic motive neither expressed nor, we think, fairly implied in the operative sections of the Act. As we said in *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229, 248 (1989): "The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime."

In *United States* v. *Turkette*, 452 U. S. 576 (1981), we faced the analogous question whether "enterprise" as used in § 1961(4) should be confined to "legitimate" enterprises. Looking to the statutory language, we found that "[t]here is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." *Id.*, at 580. Accordingly, we resolved that § 1961(4)'s definition of "enterprise" "appears to include both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *Id.*, at 580–581. We noted that Congress could easily have narrowed the sweep of the term "enterprise" by inserting a single word, "legitimate." *Id.*, at 581. Instead, Congress did nothing to indicate that "enter-

prise" should exclude those entities whose sole purpose was criminal.

The parallel to the present case is apparent. Congress has not, either in the definitional section or in the operative language, required that an "enterprise" in § 1962(c) have an economic motive.

The Court of Appeals also found persuasive guidelines for RICO prosecutions issued by the Department of Justice in 1981. The guidelines provided that a RICO indictment should not charge an association as an enterprise, unless the association exists "'for the purpose of maintaining operations directed toward an *economic* goal . . . .'" *United States* v. *Ivic*, 700 F. 2d, at 64, quoting U. S. Dept. of Justice, United States Attorneys' Manual § 9–110.360 (1984) (emphasis added). The Second Circuit believed these guidelines were entitled to deference under administrative law principles. See 700 F. 2d, at 64. Whatever may be the appropriate deference afforded to such internal rules, see, *e. g.*, *Crandon* v. *United States*, 494 U. S. 152, 177 (1990) (SCALIA, J., concurring in judgment), for our purposes we need note only that the Department of Justice amended its guidelines in 1984. The amended guidelines provide that an association-in-fact enterprise must be "directed toward an economic *or other identifiable goal.*" U. S. Dept. of Justice, United States Attorney's Manual § 9–110.360 (Mar. 9, 1984) (emphasis added).

Both parties rely on legislative history to support their positions. We believe the statutory language is unambiguous and find in the parties' submissions respecting legislative history no such "clearly expressed legislative intent to the contrary" that would warrant a different construction. *Reves* v. *Ernst & Young*, 507 U. S. 170, 177 (1993), citing *United States* v. *Turkette, supra,* at 580, quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980).

Respondents finally argue that the result here should be controlled by the rule of lenity in criminal cases. But the rule of lenity applies only when an ambiguity is present; "'it is not used to beget one. . . . The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.'" *Turkette, supra,* at 587–588, n. 10, quoting *Callanan* v. *United States,* 364 U. S. 587, 596 (1961) (footnote omitted). We simply do not think there is an ambiguity here which would suffice to invoke the rule of lenity. "'[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Sedima,* 473 U. S., at 499 (quoting *Haroco, Inc.* v. *American Nat. Bank & Trust Co. of Chicago,* 747 F. 2d 384, 398 (CA7 1984)).[6]

We therefore hold that petitioners may maintain this action if respondents conducted the enterprise through a pattern of racketeering activity. The questions whether respondents committed the requisite predicate acts, and whether the commission of these acts fell into a pattern, are not before us. We hold only that RICO contains no economic motive requirement.

The judgment of the Court of Appeals is accordingly

*Reversed.*

---

[6] Several of the respondents and several *amici* argue that application of RICO to antiabortion protesters could chill legitimate expression protected by the First Amendment. However, the question presented for review asked simply whether the Court should create an unwritten requirement limiting RICO to cases where either the enterprise or racketeering activity has an overriding economic motive. None of the respondents made a constitutional argument as to the proper construction of RICO in the Court of Appeals, and their constitutional argument here is directed almost entirely to the nature of their activities, rather than to the construction of RICO. We therefore decline to address the First Amendment question argued by respondents and the *amici.*

JUSTICE SOUTER, with whom JUSTICE KENNEDY joins, concurring.

I join the Court's opinion and write separately to explain why the First Amendment does not require reading an economic-motive requirement into the Racketeer Influenced and Corrupt Organizations Act (RICO or statute), and to stress that the Court's opinion does not bar First Amendment challenges to RICO's application in particular cases.

Several respondents and *amici* argue that we should avoid the First Amendment issues that could arise from allowing RICO to be applied to protest organizations by construing the statute to require economic motivation, just as we have previously interpreted other generally applicable statutes so as to avoid First Amendment problems. See, *e. g., Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 138 (1961) (holding that antitrust laws do not apply to businesses combining to lobby the government, even where such conduct has an anticompetitive purpose and an anticompetitive effect, because the alternative "would raise important constitutional questions" under the First Amendment); see also *Lucas* v. *Alexander*, 279 U. S. 573, 577 (1929) (a law "must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity"). The argument is meritless in this case, though, for this principle of statutory construction applies only when the meaning of a statute is in doubt, see *Noerr, supra,* and here "the statutory language is unambiguous," *ante,* at 261.

Even if the meaning of RICO were open to debate, however, it would not follow that the statute ought to be read to include an economic-motive requirement, since such a requirement would correspond only poorly to free-speech concerns. Respondents and *amici* complain that, unless so limited, the statute permits an ideological organization's opponents to label its vigorous expression as RICO predicate acts, thereby availing themselves of powerful remedial provisions that could destroy the organization. But an

economic-motive requirement would protect too much with respect to First Amendment interests, since it would keep RICO from reaching ideological entities whose members commit acts of violence we need not fear chilling. An economic-motive requirement might also prove to be under-protective, in that entities engaging in vigorous but fully protected expression might fail the proposed economic-motive test (for even protest movements need money) and so be left exposed to harassing RICO suits.

An economic-motive requirement is, finally, unnecessary, because legitimate free-speech claims may be raised and addressed in individual RICO cases as they arise. Accordingly, it is important to stress that nothing in the Court's opinion precludes a RICO defendant from raising the First Amendment in its defense in a particular case. Conduct alleged to amount to Hobbs Act extortion, for example, or one of the other, somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis. See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 917 (1982) (holding that a state common-law prohibition on malicious interference with business could not, under the circumstances, be constitutionally applied to a civil-rights boycott of white merchants). And even in a case where a RICO violation has been validly established, the First Amendment may limit the relief that can be granted against an organization otherwise engaging in protected expression. See *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958) (invalidating under the First Amendment a court order compelling production of the NAACP's membership lists, issued to enforce Alabama's requirements for out-of-state corporations doing business in the State). See also *NAACP* v. *Claiborne Hardware Co.*, *supra*, at 930–932 (discussing First Amendment limits on the assessment of derivative liability against ideological organizations); *Oregon Natural Resources Council* v. *Mohla*, 944 F. 2d 531 (CA9 1991) (applying a heightened pleading stand-

ard to a complaint based on presumptively protected First Amendment conduct).

This is not the place to catalog the speech issues that could arise in a RICO action against a protest group, and I express no view on the possibility of a First Amendment claim by the respondents in this case (since, as the Court observes, such claims are outside the question presented, see *ante*, at 262, n. 6). But I think it prudent to notice that RICO actions could deter protected advocacy and to caution courts applying RICO to bear in mind the First Amendment interests that could be at stake.