Anthony PAPPAS, Plaintiff,

v.

George PASSIAS, Demetrios Coucouzes a/k/a Archbishop Iakovos, Anthimos Panagiotopoulos a/k/a Bishop Alexios, Athena Beltecas, George Birbilis, Paul Cavounis, Tracy Demos, Gregory Fegos, Renos Georgiou, Cele Ioannou a/k/a Cecilia Ioannou, Dora Lagos, Spiro Papadopoulos, Leonidas Papalas, Frideriki Pappas, Van Pappas, Alexander Pritsos, Alice Rigas, Greek Orthodox Archdiocese of North and South America, Inc., St. Nicholas Greek Orthodox Church of Flushing, Inc., Cloud Tours, Inc., Constantine Designers & Builders, Ltd., Gregory Fegos Electric Co., Inc., Reno General Construction Corp., Chris Arlis a/k/a Chrysanthe Arlis, Michael Capous, Paul Condiles, Anastasios Diacovasilis, Harry Kalogiannis, Maureen Papalas, Theodore Perdik, Kiki Saklabanakis, Gloria Sfiroudis, Nicholas Tsesmelis, John Tsolis, Antonia Anastasiou, William Spyropoulos School, Parent–Teacher Association of the William Spyropoulos School, St. Nicholas Greek Orthodox Youth Association, Defendants.

No. 93–CV–4471 (JS).

United States District Court, E.D. New York.

June 5, 1995.

Anthony Pappas, New Hyde Park, NY, pro se.

Zawacki, DeLisio & Everett, by Therese B. DeLisio, and Margaret Dimopoulos, New York City, Spiros A. Tsimbinos, Kew Gardens, NY, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

In this case, plaintiff Anthony Pappas brings a *pro se* civil RICO action pursuant to 18 U.S.C. § 1964(c) against various persons associated with the Greek Orthodox Archdiocese of North America and South America [hereinafter, the "Archdiocese"], and the St. Nicholas Greek Orthodox Church in Flushing, New York [hereinafter, the "St. Nicholas Church"], of which the plaintiff is a member. The plaintiff alleges, *inter alia,* that the defendants (i) misappropriated funds from various organizations affiliated with the Archdiocese (including the Archdiocese), (ii) wrongfully deprived him of the opportunity to run for an elected position on the parish council of the St. Nicholas Church, and (iii) caused him emotional distress by publishing false statements about him, and by attempting to prevent his daughter from being promoted from nursery school to kindergarten. In addition to his RICO claims, the plaintiff asserts pendent state-law claims for violations of the New York Religious Corporation statute, libel and defamation, intentional infliction of emotional distress, fraud, and a breach of fiduciary duty.

The defendants now move to dismiss the plaintiff's complaint, pursuant to Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure. The plaintiff, in turn, requests leave to file an amended com-

plaint in the event that the defendants' motions are granted. For the reasons that follow, the complaint is dismissed without prejudice to permit the plaintiff to file an amended complaint.

### BACKGROUND

The plaintiff alleges a number of acts of misconduct on the part of the defendants, the most cogent of which are described below. According to the plaintiff's complaint, the Archdiocese, on or about November 24, 1980, purchased approximately 29 acres of land in Westchester County, New York, and thereafter, on or about September 26, 1983, purchased an additional 22 acres of land adjacent thereto [hereinafter, referred to collectively as the "Westchester Properties"]. *See* Complaint ¶¶ 56–57. By the end of 1986, the Archdiocese had expended approximately ten million dollars in connection with the acquisition, construction, and development of these properties. *See id.* ¶¶ 61–62. These expenditures were authorized by Chris Demetriades,[1] who served as the Director of Economic Development for the Archdiocese, *see id.* ¶¶ 50, 58, 61, and was acting pursuant to authority conferred upon him by codefendant Archbishop Iakovos, the Archbishop of the Archdiocese. *See id.* ¶¶ 51, 61.

The plaintiff alleges that a substantial amount of funds disbursed by Demetriades in connection with the Westchester Properties was not properly accounted for, and in fact was used to fund the personal projects of Demetriades and his company, Demetriades Developers, Inc. [hereinafter "DDI"]. *See id.* ¶¶ 63–64. According to the complaint, Demetriades' failure to segregate the funds belonging to the Archdiocese was revealed through an investigation conducted during 1992 and 1993 by the accounting firm of Price Waterhouse. *See id.* ¶ 65.

In early 1987, after having failed in its attempt to sell the Westchester Properties during the period between July and December 1986, the Archdiocese entered into a contract to sell the Westchester Properties to DDI. *See id.* ¶¶ 66–67. Notification of this proposed sale was announced by the Archdiocese in a number of press releases. *See id.* ¶¶ 68–69. On or about March 23, 1987, the Archdiocese commenced a proceeding in the Supreme Court, County of Westchester, to obtain court approval for the sale. *See id.* ¶ 70. Court approval was granted, and on May 18, 1987, the Archdiocese and DDI closed the sale for the Westchester Properties. *See id.* ¶ 71.

In August 1990, the Archdiocese acceded to a request by DDI to modify a mortgage financing provision of the contract of sale. In addition, in early 1992, the Archdiocese released DDI of certain material obligations under the sales contract. Court approval was not sought for either of these modifications. According to the plaintiff, these transactions are under investigation by the New York State Attorney General's office. *See id.* ¶¶ 72–74. The plaintiff further alleges that these transactions were not properly reported in the Archdiocese's financial statements, which were mailed to its members as part of its annual yearbook. *See id.* ¶ 121.

According to the plaintiff, substantial expressions of disapproval within the Greek Orthodox Church followed the disclosure of the 1990 and 1992 modifications to the 1987 contract of sale. These concerns bolstered a burgeoning reform movement spearheaded by a group called the Orthodox Christian Laity [hereinafter, the "OCL"], which since 1989, had sought greater laity involvement in civil matters affecting the governance of the Greek Orthodox Church, and in particular, greater financial accountability with respect to the Church's real estate transactions with Chris Demetriades and his company. *See id.* ¶¶ 76–77.

The plaintiff alleges that, in response to this call for reform, the Archdiocese undertook a campaign to discredit the OCL's members, including the plaintiff. This campaign included (i) the publication of defamatory statements impugning the plaintiff, (ii) the directing of a security guard forcibly to remove the plaintiff from the grounds of the St. Nicholas Church to prevent him from dis-

---

1. By stipulation and order dated February 22, 1994, the plaintiff agreed to dismiss with prejudice his claims against defendants Chris Demetriades and Demetriades Developers, Inc. *See* Stipulation and Order of Dismissal with Prejudice, dated Feb. 22, 1994 (docket entry # 18).

seminating his views, and (iii) the disqualification of the plaintiff, in December 1992, as a candidate for the parish council of the St. Nicholas Church. *See id.* ¶ 84.

Turning now to the plaintiff's specific allegations, the plaintiff alleges that, in November 1992, he was nominated to become a candidate for the parish council of the St. Nicholas Church. According to the plaintiff, in December 1992, Archbishop Iakovos and George Passias (the head priest of the St. Nicholas Church) caused to be mailed to an estimated 2,000 church members a written statement which read:

> Due to the fact that only seven canonical candidates have been nominated for seven vacant seats on the Parish Council, there will be no elections, as is usually the case, on December 13, 1992. The candidates will automatically take those seats which have been vacated this year.

*Id.* ¶ 124. The plaintiff alleges that the foregoing statement was false, and known to be false by both Iakovos and Passias, since each was aware that the plaintiff had been nominated for the parish council as an eighth candidate. *See id.* ¶ 125. Rather, this measure, which effectively nullified the plaintiff's candidacy, was initiated in response to the plaintiff's requests for financial accountability. *See id.* ¶¶ 165–166. The elections for the parish council ultimately were not held, and the other seven candidates took their seats in January 1993. *See id.* ¶¶ 177–178.

The plaintiff further alleges that, in connection with his membership in the St. Nicholas Church, he enrolled his children in the William Spyropoulos School, a parochial school, and actively participated in this school's parent-teacher association [hereinafter, the "PTA"]. *See id.* ¶¶ 129, 131. Through his participation therein, the plaintiff became aware of certain alleged irregularities and fraudulent schemes carried out through the St. Nicholas Church, including the church's failure to account for certain revenues and disbursements in financial statements that it mailed to its members. *See id.* ¶¶ 131–143. The plaintiff also became aware of, and expressed opposition to, various alleged improper schemes on the part of the PTA, including its failure to account

properly for the disbursement of funds, and to file Form 1099 tax forms reporting payments to vendors. *See id.* ¶ 150.

The plaintiff alleges that in response to his voicing of opposition, several of the defendants—who were members of the school board of the William Spyropoulos School—commenced a plot, in May 1992, to prevent the plaintiff's daughter from being promoted from nursery school to kindergarten in the William Spyropoulos School. *See id.* ¶¶ 155–156.

The plaintiff further alleges that the defendants engaged in numerous other schemes for the purpose of causing him emotional distress, and tarnishing his reputation in the community. Among them is an incident that transpired on November 29, 1992, when several members of the parish council tried to prevent the plaintiff from approaching the altar during church services. *See id.* ¶ 168. In addition, the plaintiff was threatened with arrest in December 1992 for handing out notices entitled "Down with the P.I.P. Regime" to parents attending parent-teacher conferences at the William Spyropoulos School. *See id.* ¶¶ 171–173.

The plaintiff also alleges that, in December 1992 and January 1993, the St. Nicholas Greek Orthodox Youth Association—which likewise is named as a defendant—caused promotional materials relating to a ski trip to be mailed to its members, and that these materials violated United States Postal Regulations through their reference to a profit-making entity, codefendant Cloud Tours, Inc. The plaintiff further contends that the funds collected by this association were not properly accounted for. *See id.* ¶¶ 183–184, 192–193.

Finally, the plaintiff alleges that several of the defendants, including George Passias, the head priest of the St. Nicholas Church, exerted improper influence and control over the William Spyropoulos School, its school board, its PTA, and the St. Nicholas Greek Orthodox Youth Association. *See id.* ¶¶ 194, 198. According to the plaintiff, this improper influence manifested itself in the award of contracts, without competitive bidding, to various entities, including codefendant Cloud Tours, Inc., *see id.* ¶ 207, the use of the mails

to circulate fraudulent budgets for the approval of the entities' members, and to solicit funds, *see id.* ¶¶ 209, 212–213, and the failure to file required tax returns with the federal and state tax authorities. *See id.* ¶ 214.

On September 30, 1993, the plaintiff commenced the instant action by filing a *pro se* complaint in the United States District Court for the Eastern District of New York. The complaint names 40 separate defendants, and asserts federal question jurisdiction on the basis of civil RICO, relying exclusively upon 18 U.S.C. § 1962(c) as the substantive basis for recovery thereunder. For purposes of RICO, the plaintiff contends that there are two separate enterprises: (i) the "Iakovos enterprise," named after Archbishop Iakovos, and (ii) the "Passias enterprise," named after George Passias, the head priest of the St. Nicholas Church. The plaintiff also asserts state-law causes of action for: violations of the New York Religious Corporation statute, libel and defamation of character, intentional infliction of emotional distress, and fraud. He further asserts that various persons related to the parish council of the St. Nicholas Church, and the William Spyropoulos School, including its school board and its PTA, breached fiduciary duties that they owed to him by failing to uphold his right to participate in the election for a position on the parish council, in December 1992, and by failing to investigate his allegations of impropriety.

Separate motions to dismiss have been filed in this action by (i) the Archdiocese, Archbishop Iakovos, and Bishop Alexios of the Archdiocese, and (ii) the remaining defendants. The plaintiff, in turn, has moved to amend his complaint in the event that it is dismissed, in whole or in part, with respect to any of the defendants. He also has submitted supplemental briefs and letters to the Court from time to time.[2]

## DISCUSSION

### I. Standards Governing Rule 12(b) Motion to Dismiss

▮ A district court should grant a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *Id.* at 249, 109 S.Ct. at 2906; *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). This standard applies not only to motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, but also to motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for jurisdictional defect resulting from the plaintiff's lack of standing. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *see also Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 22–23 (2d Cir.1990) (Allegations of complaint must be assumed as true for purposes of evaluating standing.). In addition, the Supreme Court has instructed that where, as in the instant case, the plaintiff is proceeding *pro se*, the district court must liberally construe the complaint's allegations. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

### II. Analysis of Plaintiff's RICO Claims

In the instant case, the plaintiff asserts that the Court has federal question jurisdiction over this case on the basis of civil RICO, as a result of the defendants' alleged violations of 18 U.S.C. § 1962(c).

"RICO renders criminally and civilly liable 'any person' [a] who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, [18 U.S.C.] § 1962(a); [b] who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering

---

2. The plaintiff has withdrawn the fifth count of his complaint, which alleges defamation, with respect to the following defendants: the Archdiocese, Archbishop Iakovos, and Bishop Alexios. *See* Pl. Second Mem. of Law, dated Apr. 11, 1994, at 22 (docket entry # 24).

activity,' § 1962(b); [c] who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c); or, finally, [d] who conspires to violate [any of] the first three subsections of [18 U.S.C.] § 1962, § 1962(d)." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232–33, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). "RICO provides for drastic remedies: conviction for a violation of RICO carries severe criminal penalties and forfeiture of illegal proceeds, 18 U.S.C. § 1963 ... and a person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees, 18 U.S.C. § 1964(c)." *H.J. Inc.*, 492 U.S. at 233, 109 S.Ct. at 2897.

The plaintiff alleges that the defendants violated 18 U.S.C. § 1962(c) by committing a pattern of predicate acts of mail fraud, indictable under 18 U.S.C. § 1341. "To establish a civil RICO claim for violation of § 1962(c), a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir.1994) (internal quotes omitted). Section 1961(1) defines "racketeering activity" to include conduct that is "chargeable" or "indictable" under a host of state and federal laws, including 18 U.S.C. § 1341, the federal mail fraud statute. *See* 18 U.S.C. § 1961(1). RICO broadly defines "enterprise" in § 1961(4) to "includ[e] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Relevant to the instant

action, nowhere in either § 1962(c), or in the RICO definitions in § 1961, is there any indication to suggest that a nonprofit religious or educational organization cannot constitute an enterprise for purposes of the statute. *Cf. National Organization for Women, Inc. v. Scheidler*, — U.S. ——, ——, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 (1994) (An enterprise for purposes of RICO does not need to have an economic motive.).[3]

As a threshold issue, however, the Court first must determine whether the plaintiff has standing to bring the claims he asserts in his complaint. The RICO civil liability provision, 18 U.S.C. § 1964(c), confers standing on "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).[4] "Thus, in order to have standing, a plaintiff must show: (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990) (citations omitted).

The second and third elements of the above formulation warrant some discussion. With regard to the second element, the injury complained of must be to business or property, and moreover, such business or property must belong to the plaintiff. *See* 18 U.S.C. § 1964(c) (providing a cause of action to "[a]ny person injured in *his* business or property by reason of a violation of section 1962") (emphasis added). Thus, emotional distress is not cognizable under RICO because it does not constitute an injury to business or property. Further, a plaintiff generally will not be permitted to bring a suit under RICO, in a personal capacity,

---

3. In *National Organization for Women, Inc. v. Scheidler*, — U.S. ——, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), a women's rights organization, together with abortion clinics, brought an action against a coalition of antiabortion groups alleging that the defendants were members of a nationwide conspiracy to shut down abortion clinics through a pattern of racketeering activity in violation of RICO. *See id.* at ——, 114 S.Ct. at 801. The Supreme Court held that RICO does not require proof that either the racketeering enterprise or the predicate acts of racketeering be motivated by economic purpose. *See id.* at ——, 114 S.Ct. at 806. Rather, the plaintiffs' allegations within their complaint that the defen-

dants' conduct was injurious to their business and property interests were sufficient to confer standing to bring a RICO claim. *See id.* at ——, 114 S.Ct. at 803.

4. 18 U.S.C. § 1964(c) provides that

[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

where the injury he alleges has been incurred by an association or organization of which he is a member, and any derivative injury to him is no different from that sustained by similarly situated members of the same association or organization. *See Bass v. Campagnone*, 838 F.2d 10, 12 (1st Cir. 1988) (Plaintiff union members lacked standing to sue under RICO "because they allege[d] an injury sustained by all of the members of the local collectively, rather than themselves individually;" since the local had not sued in its own right, the complaint of the union members in *Bass* was dismissed.); *see also Manson v. Stacescu*, 11 F.3d 1127, 1130–31 (2d Cir.1993) (Certain creditors of debtor corporation lacked standing to bring RICO claims alleging that the defendants had looted the corporation to the point of bankruptcy, because the injuries sustained by these creditors were derivative to those caused by the alleged RICO violations.), *cert. denied*, —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994); *Roeder v. Alpha Indus.*, 814 F.2d 22, 29 (1st Cir.1987) (A suit under RICO alleging injuries to the corporation "can only be brought by the corporation itself or by a shareholder suing derivatively on behalf of the corporation."); *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.) (The legal injury caused by the defendants' alleged RICO predicate acts was to the firm, and not to its shareholders, and accordingly, the shareholders lacked standing to assert a RICO claim.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). This rule recognizes that a RICO claim essentially is an asset of the association or organization that has been injured through a violation of 18 U.S.C. § 1962, and that the prosecution of a RICO suit by a single member in his own right would impair the rights of other similarly situated members, as well as prior claimants, to this asset. *See Rand*, 794 F.2d at 849.

The third element, which requires the plaintiff to allege that the violation of § 1962 caused his injury, overlaps to some extent with the second. This overlap inheres in view of the Supreme Court's enunciation that, where the plaintiff's injury is a remote consequence of a violation of § 1962, the plaintiff, depending upon the circumstances, might not be entitled to sue under RICO. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1319, 117 L.Ed.2d 532 (1992).[5] Rather, a plaintiff must demonstrate "proximate causation" in order to recover under RICO; that is to say, the plaintiff must establish that the relationship between the defendants' conduct and the injury claimed is not too remote. *See id.* at 267, 272, 112 S.Ct. at 1318, 1322. In this regard, the Second Circuit Court of Appeals has stated that "the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht*, 897 F.2d at 23–24 (citations omitted). It therefore follows that where a plaintiff alleges that his business or property has been injured through a fraud visited upon an association or organization of which he is a member, proximate causation would be lacking except

**5.** In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Securities Investor Protection Corporation [SIPC], pursuant to judicial decrees that it obtained to protect the customers of two of its member broker-dealers, brought suit against the defendants alleging, among other things, that the defendants had conspired in a fraudulent stock participation scheme that disabled certain broker-dealers. According to the SIPC, this conduct triggered the SIPC's statutory duty to advance funds to reimburse customers, and constituted a pattern of racketeering activity within the meaning of the RICO statute so as to entitle it to recover treble damages and attorney's fees. *See id.* at 263–64, 112 S.Ct. at 1314–15. The Supreme Court held that the SIPC lacked standing to bring this claim, because even assuming that it was subrogated to the rights of the customers it had reimbursed, the link was too remote between the stock manipulation alleged, which directly injured the broker-dealers by rendering them insolvent, and the nonpurchasing customers' losses, which were purely contingent on the broker-dealers' inability to pay customers' claims. *See id.* at 268, 112 S.Ct. at 1319. According to the Supreme Court, although the defendants' conduct may have constituted a cause in fact in bringing about the plaintiff's injuries, RICO requires a plaintiff to demonstrate proximate cause in order to recover thereunder; because the injury claimed was too remote to the alleged conspiracy to manipulate, the SIPC failed to establish a right to sue the defendants. *See id.* at 267, 272, 112 S.Ct. at 1318, 1322.

to the extent that the plaintiff can show that he has sustained some separate injury to his business or property that arises apart from his status in relation to the subject association or organization. *Cf. Roeder*, 814 F.2d at 30 ("It is only where the injury sustained to one's stock is peculiar to him alone, and does not fall alike upon other stockholders, that one can recover as an individual.") (internal quotes omitted).

Applying the foregoing principles to the instant case, the Court concludes that the plaintiff lacks standing to assert a RICO claim in his own right, because he fails to allege facts in his complaint that, if true, would establish that the defendants' conduct has caused injury to *"his* business or property." 18 U.S.C. § 1964(c) (emphasis added). Although the plaintiff claims that the defendants have misappropriated funds from various nonprofit organizations of which he is a member, the injury to business or property that he alleges is not *his* injury, but rather, the injury sustained by the subject organizations. Therefore, if the plaintiff wishes to vindicate the rights of these organizations, he must bring suit on their behalf in a derivative or representative capacity. This distinction is not without substantial consequences; because the plaintiff's maintenance of a derivative or representative action directly affects the rights of similarly situated persons, the Federal Rules of Civil Procedure entrust the courts with a fiduciary responsibility to ensure that the plaintiff fairly and adequately represents the interests of members similarly situated in enforcing the rights of the organization on behalf of which the suit is brought. *See* Fed.R.Civ.P. 23.1, 23.2; *cf. Rand*, 794 F.2d at 849 (A RICO action to recover for injury to the corporation "is a corporate asset, and shareholders cannot bring it in their own names without impairing the rights of prior claimants to such assets."). Thus, for example, it may be necessary to ensure that the plaintiff is represented by counsel in view of the proliferated rights at stake.

Further, the plaintiff's assertion that the defendants caused him emotional distress is not cognizable for purposes of RICO, because such does not constitute an injury to business or property. Thus, the plaintiff's allegations of emotional injury do not accord him standing to bring suit under RICO.

■ There is one final matter that the Court wishes to address in connection with its determination that the plaintiff lacks standing to bring suit under RICO. The Court notes that, in summarizing his RICO causes of action set forth in Counts I and II of his complaint, the plaintiff, on two separate occasions, alleges in general terms that the defendants' conduct "directly harmed the plaintiff's pecuniary interest." *See* Complaint ¶¶ 231, 238. The plaintiff further alleges an injury to his pecuniary interest in the demand-for-judgment section of his complaint. In view of the comprehensiveness of the *factual* allegations within the complaint, which omit any reference to injury to plaintiff's business or property, the Court regards these conclusory allegations of injury to pecuniary interest to be insufficient to withstand a motion a dismiss, notwithstanding the fact that the plaintiff is proceeding *pro se.* The Court takes this view, having carefully reviewed the factual allegations in the complaint, because it appears that the plaintiff's conclusory allegations of pecuniary loss refer to the losses sustained by the organizations of which he is a member, and for which, as previously discussed, the plaintiff lacks standing to bring suit in a personal capacity. *Cf. National Organization for Women, Inc. v. Scheidler*, —— U.S. ——, ——, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994) (" '[A]t the pleading stage, general *factual* allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.' ") (emphasis added) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992)).

In sum, therefore, viewing the complaint as a whole, the plaintiff's conclusory allegations of injury to pecuniary interest are clearly contrary to the detailed factual allegations that he pleads, which omit any reference to injury to business or property that he has sustained in his own right. Accordingly, these conclusory allegations cannot afford

the plaintiff the standing to sue that his factual allegations so unequivocally belie. Insofar as the RICO counts provide the sole basis for original federal jurisdiction, the plaintiff's pendent state-law claims also must be dismissed, since the Court is without subject matter jurisdiction to adjudicate the plaintiff's remaining claims. *See* 28 U.S.C. § 1367(c)(3).

## III. Plaintiff's Motion to Amend His Complaint

Having determined that the plaintiff's complaint is unable to withstand the defendants' motions to dismiss, the Court now must consider whether it should grant the plaintiff leave to amend his complaint.

" 'In order for an application to amend a pleading to be denied, the nonmovant must demonstrate either bad faith on the part of the moving party, the futility of the claims asserted within the application, or undue prejudice to the nonmovant.' " *Persaud v. Exxon Corp.,* 867 F.Supp. 128, 135 (E.D.N.Y. 1994) (quoting *Katzman v. Sessions,* 156 F.R.D. 35, 38 (E.D.N.Y.1994)). The defendants are unable to make the requisite showing at this juncture of the litigation. Specifically, the Court is unpersuaded by the defendants' argument that it would be futile to allow the plaintiff to amend his complaint. It seems to the Court that the defects in pleading previously discussed may be cured through adherence to the considerations set forth in this Memorandum and Order. In addition, the defendants' concern regarding the plaintiff's failure to plead a proper RICO enterprise could be remedied, by pleading as RICO enterprises, the various nonprofit organizations that the plaintiff alleges to have been conducted through a pattern of racketeering activity. Further, any failure on the part of the plaintiff to distinguish between a "RICO person" and a "RICO enterprise," which generally would be fatal to a claim asserted under 18 U.S.C. § 1962(c), could be remedied by pleading a cause of action under 18 U.S.C. § 1962(a), which does not require the "RICO person" and the "RICO enterprise" to be two separate entities. *See Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 668 (2d Cir.1989) ("[U]nder

§ 1962(a), it may be possible for a defendant to also be the enterprise."). Thus, the Court is unable to conclude at this juncture that it would be futile to allow the plaintiff to file an amended complaint. Accordingly, plaintiff's motion for leave to file an amended complaint is granted.

### CONCLUSION

In accordance with the foregoing, the Court enters the following orders in this action:

(1) The defendants' motions to dismiss the plaintiff's complaint are GRANTED and the complaint is dismissed in its entirety as against all defendants. Fed.R.Civ.P. 12(b)(1).

(2) The plaintiff's motion for leave to amend his complaint is GRANTED. Fed. R.Civ.P. 15(a). The plaintiff is directed to file his amended complaint within sixty days of the docketing of this Memorandum and Order.

SO ORDERED.