IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10295

_____


NORMAN T. TOMPKINS, M.D.; CAROLYN TOMPKINS,

                    Plaintiffs - Counter Defendants - Appellees,

                         versus

THOMAS CYR, ET AL.,

                                        Defendants,

LOUIS FARINHOLT,

                                        Defendant-Appellant

THOMAS CYR; PHILLIP BENHAM; OLDRICH
TOMANEK; MARILYN FARINHOLT; CARLA
MICHELE; JOAN BLINN; RICHARD BLINN;
DAVID CASE; DEBRA CASE; LAURA TELLIER;
CAROL A. HOGAN; JOHN WESLEY THOMPSON;
L. V. SPURLOCK; BRENDA SPURLOCK;
CYNTHIA V. BROWN; GREGORY J. HAWLEY;
NICHOLAS J. WURTH; REGINALD HARRIS;
RON A. ZAJAC; DALE A RASCHE; ILENE E.
COVENTRY; MARCO A. MEDINA; JAMES M.
FENNELL, JR.; PHYLLIS A. HALL; DAVID HALL;
JONATHAN E. HODGES; ANN HOLLACHER,

                    Defendants - Counter Claimants - Appellants.
_____

       Appeals from the United States District Court for the
                 Northern District of Texas, Dallas
_____
                       January 28,2000
Before JOLLY and SMITH, Circuit Judges, and SARAH S. VANCE,[*]
District Judge.

E. GRADY JOLLY, Circuit Judge:

―――――――――――――

       [*]District Judge of the Eastern District of Louisiana, sitting
by designation.

This appeal presents a chronicle of abortion protestors whose means of protesting the medical practice of a doctor, who performed abortions, exceeded the means permitted by law. The jury returned a verdict of approximately $8 million. We review the trial and verdict in this appeal.

I

A

Doctor Norman T. Tompkins used to specialize in obstetrics and gynecology. As part of his practice, he would periodically perform abortions. That made him a target of a Dallas anti-abortion group called the Dallas Pro-Life Action League ("Dallas PLAN"). In October 1992, the Dallas PLAN began a campaign to persuade Dr. Tompkins and nineteen other doctors to stop performing abortions.

The Dallas PLAN's efforts started quietly. Thomas Cyr, President of the Dallas PLAN, scheduled a meeting with Dr. Tompkins at Dr. Tompkins's office. At the meeting, Cyr demanded that Dr. Tompkins sign a statement "swear[ing] . . . never to participate directly or indirectly in abortion." Cyr then threatened to "make [Dr. Tompkins'] practice go away" if he did not sign the statement, as the Dallas PLAN had done with another local physician who finally submitted after relentless, targeted protests by the Dallas PLAN. But Dr. Tompkins was not intimidated, and when he refused to sign the statement, the meeting ended.

As Cyr had warned, the picketing at Dr. Tompkins's home and office, and his wife's place of employment, began soon thereafter

and continued unabated for ten months. At first, the demonstrations were large, with about ninety people and lasting a couple of hours. Over time, the protestors dwindled to a handful. But they continued to demonstrate on Saturday mornings and Sunday afternoons for at least two hours, and weekdays as Dr. Tompkins and his wife, Carolyn Tompkins, left for and returned from work. Sporadic protests also took place at Dr. Tompkins's office and at his church.

During the picketing, the demonstrators would chant, sing, and pray. They carried signs with photos of bloody and dismembered fetuses and calling Dr. Tompkins an "abortionist," a "murderer," and a "tool of Satan." One of the leaders, Phillip Benham, sometimes used a bullhorn to preach to the crowd.

The picketers would also invade the Tompkinses' private property. Oldrich Tomanek was seen placing posters on the Tompkinses' house and gate, and Benham once sat on their front porch. One day, the Tompkinses returned home to find dozens of small white crosses planted in their yard. On Thanksgiving Day, the Tompkinses' dinner was interrupted by Tomanek shaking their front gate and shouting.

The campaign against the Tompkinses involved other tactics to increase pressure besides picketing. The demonstrators held at least eight separate marches through Dr. Tompkins's neighborhood, handing out anti-abortion literature and posting pictures of Dr. Tompkins with a caption that read "Not Wanted." At the Dallas

PLAN's instigation, moreover, hundreds of postcards and letters were mailed to Dr. Tompkins, urging him to "stop the killing." Dr. Tompkins also received numerous phone calls at all hours of the day and night exhorting him to end his abortion practice. Cyr and Tomanek called so incessantly that Dr. Tompkins and his wife began to recognize specifically their voices.

The campaign also involved surveillance. Cyr, Tomanek, and Louis Farinholt would often park in a cul-de-sac behind the Tompkinses' house and spy on the Tompkinses inside their house using binoculars and cameras. Tomanek even sent the Tompkinses postcards warning them that he had been watching them. When the Tompkinses would leave home, members of the Dallas PLAN would follow them. Sometimes the demonstrators left pamphlets and fliers on the windshield of Dr. Tompkins's car when it was parked. Once, Cyr, Tomanek, and Mr. Farinholt followed Dr. Tompkins into a restaurant and confronted him about his abortion practice, forcing him to leave the restaurant. Another time, Cyr and Tomanek tailed the Tompkinses on the way to a party, which led to a high speed chase and Dr. Tompkins calling the police.

During the campaign, two sets of incidents particularly frightened the Tompkinses. The first set included two confrontations Mrs. Tompkins had with Tomanek. In November 1992, Tomanek approached Mrs. Tompkins as she opened her garage door to take out the garbage. Towering over her, he exclaimed, "Mrs. Tompkins, Mrs. Tompkins, you've got to stop your husband from

4

killing babies. He's killing babies, and I've got to talk to you."
On another occasion, as Mrs. Tompkins was getting her mail, Tomanek ran up to her, shouting: "Stop the killing now. Aren't you afraid, Mrs. Tompkins, I'm going to shoot you now?" This set of incidents also included an instance when Tomanek allegedly called Dr. Tompkins's office and left a message that he was going to "get [him]."

The second set of incidents was different, both in its nature and its source: it was more graphic and threatening, but was anonymous. While the Dallas PLAN campaign was underway, Dr. Tompkins and his wife received several anonymous letters that were, in contrast to the PLAN letters, strongly threatening in nature. In addition, a few anonymous telephone callers made explicit and graphic death threats. It was also during this time that the press reported that a gynecologist in Florida had been shot by a member of an anti-abortion group.

The events that occurred during the Dallas PLAN's campaign against the Tompkinses virtually destroyed the Tompkinses' privacy and sense of security. The Tompkinses hired bodyguards to escort them twenty-four hours a day. Dr. Tompkins began wearing a bullet-proof vest when he was in public, and he equipped his car with a bomb-detection device. The Tompkinses told their adult children not to visit them. Mrs. Tompkins stopped going to see her daughter, who lived nearby, so that the protestors would not learn her daughter's address. Their daughter's wedding was held outside

5

Dallas, with no announcement in the Dallas newspapers, in order to avoid attracting attention. There seems to be little doubt that the harassment, some mild, some serious, was constant.

Dr. Tompkins's medical practice suffered. He previously had seen twelve-to-fifteen patients per day, but afterwards he saw only two or three. His baby deliveries dropped from five or six per week to one or two. As a result, Dr. Tompkins could not pay rent for his Presbyterian Hospital office. In April 1994, Dr. Tompkins closed his medical practice of some twenty-six years and moved to Gainesville, Texas, more than one hour from Dallas.

In Gainesville, Dr. Tompkins began emergency room work to meet his financial obligations, involving longer, erratic hours. Unlike his Dallas practice, Dr. Tompkins's Gainesville practice consisted mostly of Medicare and Medicaid patients, so it was less lucrative. For that reason, Mrs. Tompkins did not accompany her husband to Gainesville, but remained in Dallas at her job.

The events during this period also disrupted the Tompkinses' mental well-being. Dr. Tompkins, once considered affable and outgoing, became moody, withdrawn, anxious, and easily-angered. He began to have trouble eating and sleeping, feared for his life, and had a recurring nightmare about being shot and having his daughter discover his body. Mrs. Tompkins also had trouble eating and sleeping, and frightened easily. She became depressed and overly-emotional.

B

Ultimately, the Tompkinses took legal action against thirty-eight of the protestors. They sued in state court for intentional infliction of emotional distress, tortious interference with a residential sales contract and with Dr. Tompkins's business, invasion of privacy, civil conspiracy, and various other torts. The state court issued a preliminary injunction limiting the frequency, duration, and nature of the picketing near the Tompkinses' home and church. When the Tompkinses amended their complaint to include a RICO claim, the defendants removed the case to federal court.

After a one-week trial, the jury returned a verdict on October 25, 1995. The Tompkinses prevailed on their claims for intentional infliction of emotional distress, invasion of privacy, and civil conspiracy. The jury awarded $2,248,000 for the intentional infliction of emotional distress and $2,800,000 for the invasion of privacy. The jury also assessed $3,450,000 in exemplary damages against the protestors. The Tompkinses did not prevail on their tortious interference claim, and the jury was unable to reach a unanimous verdict on the civil RICO claim.

Not all the thirty-eight defendants named in the Tompkinses' complaint were included in the jury verdict, however. The jury ruled against only eleven of them, and the court set aside the verdict with respect to one of those eleven, Laura Tellier. The other twenty-seven were absolved in the following ways. The Tompkinses voluntarily nonsuited three defendants several weeks

after bringing the suit. The Tompkinses then dismissed their claims against sixteen of the defendants on the first day of trial. After presenting their case-in-chief, the Tompkinses nonsuited six more defendants. Finally, one defendant successfully moved for judgment as a matter of law, and the jury exonerated another.

After trial, twenty-three of the defendants not included in the jury verdict, along with Laura Tellier, sought sanctions against the Tompkinses. They based their sanctions claims on Rule 11 of the Federal Rules of Civil Procedure and Rule 13 of the Texas Rules of Civil Procedure. These defendants argued that the Tompkinses had failed to reasonably investigate the defendants' involvement before suit was filed, and that the various claims levied against those defendants were not supported by good faith legal arguments. The district court disagreed, and denied the motion for sanctions.

On appeal, several of the defendants liable for the $8.5 million have challenged the judgment, and others appeal the district court's denial of sanctions.

## II

At the outset, it is important to distinguish between the two sets of appellants in this case. The first set, hereinafter referred to as the "losing defendants," consists of four of the eleven defendants against whom the district court leveled its $8.5 million judgment: Cyr, Benham, Tomanek, and Mr. Farinholt. They

challenge the judgment against them. The remaining six do not appeal.

The second set, hereinafter referred to as the "winning defendants," consists of some of those not found liable at trial and who sought and were denied sanctions: Marilyn Farinholt; Carla Michele; Joan Blinn; David Case; Debra Case; Laura Tellier; Carol A. Hogan; John Wesley Thompson; L. V. Spurlock; Brenda Spurlock; Cynthia V. Brown; Gregory J. Hawley; Nicholas J. Wurth; Reginald Harris; Ron A. Zajac; Dale A. Rasche; Ilene E. Coventry; Marco A. Medina; James M. Fennell, Jr.; Phyllis A. Hall; David Hall; Jonathan E. Hodges; and Ann Hollacher. This group focuses exclusively on the district court's denial of sanctions against the plaintiffs.

## III

We will begin by addressing the losing defendants' arguments contesting the judgment.[1] First, these defendants contend that admission of testimony, transcripts, audio recordings, and letters concerning anonymous threats is reversible error because it was highly prejudicial. Second, these defendants charge that there is

---

[1]The Tompkinses argue that we are unable to adjudge the defendants' claims because the defendants failed to include the trial transcript in the record on appeal. We, however, do have the transcript, and though some of the volumes may be marked "supplemental," the Tompkinses do not challenge the defendants' ability to supplement the record on appeal. Regardless, dismissal in the absence of a transcript is discretionary. Coats v. Pierre, 890 F.2d 728, 731 (5th Cir. 1989). We will, therefore, adjudge the defendants' appeal on the merits.

9

insufficient evidence connecting the defendants' unlawful conduct with harm to the plaintiffs. Third, the losing defendants argue that the verdict is excessive and/or duplicative.

IV

A

The losing defendants first challenge the trial court's admission of evidence that they contend was "highly prejudicial." Presumably, they are arguing, without explicitly doing so, that this evidence should have been excluded under Federal Rule of Evidence 403 because the prejudicial effect substantially outweighed the probative value.

The defendants make this argument with respect to three types of evidence. The first type is testimony by Dr. and Mrs. Tompkins about anonymous telephone calls and letters they received. The anonymous callers and letters explicitly threatened the Tompkinses' lives. There was, however, no evidence that the calls and letters came from any of the defendants.

The second type consisted of actual recordings and transcripts of the anonymous threatening calls, along with several letters the Tompkinses had received containing threats. Again, none of this was attributed to any of the defendants.

The third type is testimony by Dr. and Mrs. Tompkins that they were aware of the murder of a gynecologist in Florida who was allegedly killed because he conducted abortions. They further testified to their fear that this could happen to them.

10

Before evaluating the losing defendants' argument, we must determine the proper standard of review. If the party charging reversible error raised the appropriate objection at trial, admission of evidence must rise to an abuse of discretion in order to qualify as "error," United States v. Duncan, 919 F.2d 981, 985 (5th Cir. 1990), and such error is reversible only if not harmless. Fed. R. Civ. Proc. 61. On the other hand, when a defendant fails properly to object to the admission of evidence, we review that admission solely for plain error. Whitehead v. Food Max of Mississippi, Inc., 163 F.3d 265, 274 (5th Cir. 1998); Fed. R. Evid. 103(d). There are four prerequisites to a finding that the district court committed plain error in admitting specified evidence:

   (1) an error;

   (2) that is clear and obvious under current law;

   (3) that affects the defendant's substantial rights; and

   (4) that would seriously affect the fairness, integrity or
       public reputation of judicial proceedings if left
       uncorrected.

Rushing v. Kansas City Southern Railway Co., 185 F.3d 496, 506 (5th Cir. 1999), *petition for cert. filed* (Dec. 28, 1999)(No. 99-1090).[2]

---

[2]We have previously determined that the methodology for analyzing for plain error in the criminal law context applies to the civil law context as well. Highlands Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh, 27 F.3d 1027, 1032 (5th Cir. 1994).

The party charging error bears the burden of proof for establishing these various criteria. United States v. Claverley, 37 F.3d 160, 164 (5th Cir. 1994)(en banc).

C

We now must examine the objections the defendants raised at trial to determine which standard of review to use.

As already mentioned, one type of evidence was testimony by Mrs. and Dr. Tompkins about the anonymous threats. Mrs. Tompkins testified first. During her testimony about the anonymous threats, defense counsel repeatedly objected solely on hearsay grounds.[3] Later, when Dr. Tompkins was on the stand, defense counsel again lodged a hearsay objection. However, counsel also objected that the testimony was unduly prejudicial. Thus, the losing defendants only raised the proper objection to evidence of the anonymous threats during Dr. Tompkins's testimony. As we have noted, his testimony occurred after that of his wife.

The second type of evidence was the actual letters and audio recordings of these anonymous threats. During trial, counsel for

---

[3]The losing defendants have not repeated this argument before us with good reason. Federal Rule of Evidence 801(c) clearly defines what hearsay is: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." (Emphasis added). Neither the testimony as to the threats, the recordings, the transcripts, nor the letters constituted hearsay. The threats here were not, and were not alleged to be, factual statements, the truth of which was in question. Rather, the threats were verbal acts. United States v. F/N/U Pate, 543 F.2d 1148, 1149 (5th Cir. 1976).

the defendants repeatedly objected that the evidence was hearsay. Counsel also objected several times that it was duplicative, given that there was already testimony on the record as to both the calls and the letters. With respect to this type of evidence, the losing defendants never raised the objection they now make before us, i.e., that it was highly prejudicial.

With respect to the third type, testimony about another murder in Florida, the defendants did object that the evidence was prejudicial.

For these reasons, we now must determine whether the district court committed plain error under Rule 403 when it admitted most of the evidence of anonymous threats. We will then evaluate the evidence that was properly objected to: Dr. Tompkins's testimony about the anonymous threats and Dr. and Mrs. Tompkins's testimony about the Florida murder. We must decide whether admission of this testimony constituted an abuse of discretion, and, if so, whether it was harmless error.

D

To determine whether admission of the anonymous threats was plain error under Rule 403, we must evaluate, first, its relevance and, second, its prejudicial effect. We begin with its relevance.

The district court allowed the admission of this evidence as "relevant to the plaintiffs' state of mind" because the Tompkinses were charging emotional distress and mental anguish. When these damages are asserted, the victim's state of mind at the time of the

13

tort is relevant to allegations of harm.  <u>Star Houston, Inc. v. Shevack</u>, 886 S.W.2d 414, 418 (Tex.App. Houston 1994).

The defendants argue, however, that evidence of the anonymous threats is not relevant because they are not responsible for the anonymous threats.  The Tompkinses made no attempt to attribute the anonymous letters and calls to the losing defendants.  Nor did the Tompkinses try to show that the threats were caused by the defendants' unprotected (i.e., targeted picketing), as opposed to protected (marching through the streets) conduct.[4]

Under Texas law, however, tortfeasors take their victims as they find them, even when the claimed harm is mental anguish or emotional distress.  <u>Coates v. Whittington</u>, 758 S.W.2d 749, 752-53 (Tex. 1988).  A victim's particular susceptibility will not reduce the damages available.  <u>Shevack</u>, 886 S.W.2d at 418.

In this case, the anonymous threats--threats of physical harm and even death--made the Tompkinses particularly vulnerable to psychological harm from the losing defendants' unlawful conduct.  Evidence about the threats, therefore, was relevant to helping the jury evaluate the degree of impact and the seriousness of the

---

[4]When, as here, some of a defendants' conduct is lawful because of First Amendment protection, and some is unlawful because unprotected, "[o]nly those losses proximately caused by [the] unlawful conduct may be recovered."  <u>NAACP v. Clairborne Hardware Co.</u>, 458 U.S. 886, 918, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Supreme Court explained what types of conduct are and are not protected by the First Amendment in <u>Frisby v. Schultz</u>, 487 U.S. 474, 479-488, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). For example, marching through a neighborhood is protected, but targeting and picketing a specific home is not.  <u>Id.</u>

14

anguish and the distress that the losing defendants' unlawful conduct caused.[5]

We turn now to the prejudicial effect. At trial, the Tompkinses presented clearly admissible and unchallenged testimony about other threats, threatening conduct, and months of unrelenting harassment directly attributable to the losing defendants. When we consider all of this evidence that was properly before the jury, the impact of the anonymous threats is substantially lessened. Thus, we doubt that the prejudicial effect substantially outweighed the important probative value that this evidence held. In any event, the prejudicial effect certainly did not "clearly" outweigh the probative value. In sum, even if there was arguable error under Rule 403, that error was not clear for purposes of applying the plain error rule. The admission of this evidence, therefore, is not reversible error.[6]

E

---

[5]This, certainly, is not to say that the jury could impose liability for anguish or distress resulting from constitutionally-protected activities, even if the threats made the Tompkinses particularly susceptible. For example, the losing defendants could have engaged solely in lawful protesting in the Tompkinses' neighborhood. The Tompkinses may still have received death threats and may have been aware that another gynecologist had been shot. Even if the Tompkinses felt anguish and distress at the protestors' activities in that context, the protestors would not be liable. A person's susceptibility cannot restrict the breadth of another's First Amendment protections.

[6]Because the admission of the evidence of anonymous threats does not satisfy the first two criteria of plain error, we need not address the impact on the defendants' substantial rights and/or on the fairness, integrity, or public reputation of the proceedings.

The defendants made the proper Rule 403 objection with respect to the anonymous threats only once, during Dr. Tompkins's testimony. We normally would evaluate the losing defendants' argument with respect to admission of this evidence first for an abuse of discretion and then for harmlessness.

In this case, however, we need not evaluate whether admission was an abuse of discretion because by the time the testimony was admitted, any error in admitting it would have been harmless given all the evidence that had preceded it. See Fed. R. Civ. P. 61. Dr. Tompkins's testimony occurred after similar testimony by Mrs. Tompkins and admission of the recordings, transcripts, and letters themselves. The impact of Dr. Tompkins's testimony about these threats, therefore, was minimal and the mere repetition of testimony already verified could not have affected the defendants' substantial rights.

F

Finally, the defendants also made the proper objection with respect to testimony about the Florida murder. We therefore evaluate the admission for an abuse of discretion. In admitting that evidence, the judge specifically limited consideration of it to the Tompkinses' state of mind.

We do not believe admission of this evidence was an abuse of discretion. Its probative value is similar to that of the anonymous death threats discussed above. It allows the jury to understand the mental frame of mind of the Tompkinses when the

16

defendants were engaging in their unlawful conduct. It enables the jury to evaluate the emotional impact, for example, of coming home to find small white crosses in the yard, to understand Mrs. Tompkins's fear when one of the protesters asked whether she expected to be shot, or the stress and anger the Tompkinses felt when the protestors were spying into the privacy of the Tompkinses' home and private lives. In sum, it helps explain the Tompkinses' mental and emotional reactions to the losing defendants' activities. The prejudicial effect of this evidence against the defendants is less, however, than of the evidence of the anonymous threats. The murder had occurred in a different state and had no connection with the protestors involved here. There is no danger that the jury would attribute the murder to this group of defendants. We cannot say, therefore, that admission of the testimony constituted an abuse of the trial judge's discretion.

V

In their brief, the losing defendants also assert that there is no evidence that the defendants' unprotected activity caused the Tompkinses' harm. This point is essentially an appeal of the district court's rejection of the defendants' Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a).

We review this claim <u>de novo</u> and apply the same legal standard as the trial court. <u>Nero v. Industrial Molding Corp.</u>, 167 F.3d 921, 925 (5th Cir. 1999). We therefore examine all the evidence in

17

the light most favorable to the jury verdict to determine if there were sufficient facts to support that verdict.  Id.

At trial, the Tompkinses presented undisputed evidence of illegal conduct and harm.  The defendants concede the evidence of their unlawful activities, including the targeted picketing, parking behind and surveilling the house, trespassing, making apparent verbal threats, and following and chasing the Tompkinses' car.  These defendants do not deny the evidence of harm to the Tompkinses, such as continuing fear, problems sleeping and eating, hiring a bodyguard and wearing a bullet-proof vest, and Dr. Tompkins's moving his practice to Gainesville.

Because evidence of both tortious conduct and harm are clearly sufficient, the only question is causation.  We think the Tompkinses established that element at trial as well.  Under Texas law, causation need not be supported by direct evidence. Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation.  Texas Dept. of Transportation v. Olson, 980 S.W.2d 890, 893 (Tex. App. Fort Worth 1998)(citing Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 459 (Tex. 1992)).  Establishing causation requires facts sufficient for the fact-finder reasonably to infer that the defendants' acts were a substantial factor in bringing about the injury.  Purina Mills, Inc. v. Odell, 948 S.W.2d 927, 936 (Tex. App. Texarkana 1997).  At trial, Dr. and Mrs. Tompkins testified about their reactions of fear, stress, anxiety, depression, and sadness to several specific

18

instances of the defendants' unlawful conduct. When there was no such direct testimony connecting conduct with effect, the facts were sufficient for the jury to draw an inference of causation.

The defendants' contention on causation, that the evidence was "hopelessly muddled," is inapposite. We generally do not review evidence to give a grade on the clarity of its presentation; we review for sufficiency to support the finding. It is the lawyers' job to present and sort the evidence so that the jury may clearly understand it and the points that the lawyers wish to make with regard to it. Here, defense counsel had opportunities on cross-examination and during closing argument to distinguish between damages resulting from lawful and unlawful conduct. If counsel failed to do that here, that does not mean we should overturn the verdict, so long as the evidence is there to support the verdict.[7]

## VI

Finally, the losing defendants challenge the damage award as excessive. There are two elements to their argument. First, they charge that the damages were excessive because they clearly exceeded the amount warranted by the harm caused. Second, they charge that the Tompkinses' recovery was excessive because it was

---

[7]These comments should not be construed, however, as approval of the jury instructions in this case that set out liability for unlawful, as opposed to lawful, conduct. Since the losing defendants did not raise this issue in their briefs, however, they have waived their chance to appeal on that basis. DSC Communications Corp. v. Next Level Communications, 107 F.3d 322, 326 n.2 (5th Cir. 1997).

19

duplicative. This argument makes two points. First, the award was duplicative because it granted damages for both mental anguish and, emotional distress when these two injuries are the same thing; and, second, the award was duplicative because the jury awarded damages under two theories for the same single harm.

A

We first address the losing defendants' attack on the amount of the award. Our review of a damage award for emotional distress and mental anguish is conducted with deference to the fact-finder because of the intangibility of the harms suffered. Patterson v. PHP Healthcare, 90 F.3d 927, 937-38 (5th Cir. 1996).

The Tompkinses claimed mental anguish and emotional distress, and the record leaves no doubt that their claims were genuine. During this period, the Tompkinses faced frequent picketing of their respective offices and home and of their neighborhood, were followed and chased in their car, were challenged by demonstrators in a restaurant, were confronted in their church by a demonstrator, had people staked out behind their home surveilling their private activities, had their property trespassed, had crosses placed in their yard, received a barrage of phone calls and mail, and also received several anonymous death threats. All this was happening soon after the shooting of another gynecologist for conducting abortions, which was widely reported in the press.

We cannot say that the amount of the damages is demonstrably out of line with the harm. Because of both the defendants' conduct

and the Tompkinses' particular susceptibility, the Tompkinses lived in genuine fear for their lives for an extended period of time. The evidence supports the conclusion that the protestors turned their lives into a hellish, torturous experience. The ten-month episode permanently affected their life-style, their professional lives, their enjoyment of life, their personalities, their economic well-being, and their general emotional well-being.

In their briefs before us, the losing defendants seek to limit damages to those arising from the activities of a single demonstrator, Mr. Farinholt. But each of the losing defendants is jointly and severally liable for the actions of the others because all were found to be co-conspirators in a civil conspiracy. See Operation Rescue v. Planned Parenthood, 975 S.W.2d 546, 561 (Tex. 1998)("a conspiracy finding obviates the necessity of demonstrating the propriety of injunctive relief against each co-conspirator"); Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925-26 (Tex. 1979)("Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'"). Liability, therefore, was correctly imposed on the group of losing defendants.

B

(1)

The losing defendants also contend that the damage award was duplicative in two ways. First, the jury awarded damages both for emotional distress and for mental anguish, when these are in fact

21

the same thing.  Second, the Tompkinses recovered twice for the same harm under two different theories of recovery, intentional infliction of emotional distress and invasion of privacy.

As a threshold matter, we must determine the appropriate standard of review.  Both of these elements charged by the losing defendants are essentially objections to the jury instructions, particularly as they are reflected on the special verdict form.  But the defendants did not object to these instructions at trial.  Federal Rule of Civil Procedure 51, therefore, limits the defendants' ability to appeal on these grounds: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."  At the same time, "the failure to object does not create a jurisdictional bar to appellate review." 9 James W. Moore, Moore's Federal Practice § 51.21[2].  We have previously entertained tardy jury instruction objections under the plain error standard of review, and we do so here.  Nero v. Industrial Molding Corp., 167 F.3d 921, 931-32 (5th Cir. 1999).

In reviewing jury instructions for plain error, we are exceedingly deferential to the trial court.  We previously have explained the reason for making such an appeal so difficult:

> Few jury charges in cases of complexity will not yield
> "error" if pored over, long after the fact in the quiet
> of the library--if such an enterprise is to be allowed.
> It is not.  The reality is that most such "errors" will
> be washed away if the trial court is given a fair

22

> opportunity to consider them. In short, so long as the trial judge gives counsel a fair opportunity to object, we will listen to unobjected-to rulings only in those handful of cases that can meet the exacting requirements of plain error. [United States v.] Olano and Rule [of Civil Procedure] 51 do not interpose technical barriers or lay traps. These rules vindicate powerful interests in orderliness and finality. They also reflect the central role of the United States District Court. It is not a way station or entry gate. Rather, trials are the heart of the system. Trial, not appeal, is the main event. The rules we enforce today tether these statements to reality.

Highland Ins. Co. v. National Union Fire Ins. Co., 27 F.3d 1027, 1032 (5th Cir. 1994). To overturn a verdict for plain error in the instructions, we must find an obviously incorrect statement of law, id., that "was probably responsible for an incorrect verdict, leading to substantial injustice." Automotive Group v. Central Garage, Inc., 124 F.3d 720, 730 (5th Cir. 1997).

(2)

(a)

We now turn to the defendants' first charge of duplicative recovery, that emotional distress and mental anguish are the same injury. The special verdict form that the court gave the jury separated mental anguish and emotional distress and allowed the jury to impose damages for each. For the reasons that follow, we do not think that the defendants have made a case for plain error.

This part of the instructions on the verdict form is not obviously incorrect in relation to existing law. Although "mental anguish" and "emotional distress" are often used interchangeably under Texas law, there are also cases treating the two as distinct.

23

Compare Daughety v. National Ass'n of Homebuilders of the United States, 970 S.W.2d 178, 180 (Tex.App. Dallas 1998)(treating the two as separate); Savage v. Psychiatric Institute of Bedford, 965 S.W.2d 745, 753 (Tex.App. Fort Worth 1998)(same); Insurance Co. of North America v. Morris, 928 S.W.2d 133, 151 (Tex.App. Houston 1996)(same)(reversed on other grounds); Edinburg Hospital Authority v. Trevino, 904 S.W.2d 831, 840 (Tex.App. Corpus Christi 1995)(same)(reversed on other grounds); with State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 435 (Tex. 1995)(treating the two as distinct); Seminole Pipeline Co., et al. v. Broad Leaf Partners, Inc., 979 S.W.2d 730, 754 (Tex.App. Houston 1998)(same); Stokes v. Puckett, 972 S.W.2d 921, 924 (Tex.App. Beaumont 1998)(same); Stevens v. State Farm Fire and Casualty Co., 929 S.W.2d 665, 674 (Tex.App. Texarkana 1996)(same); Wyatt v. Kroger Co., 891 S.W.2d 749, 751 n.1 (Tex.App. Fort Worth 1994)(same).[8]  The case law also defines the two terms differently. Compare Benefit Trust Life Ins. Co. v. Littles, 869 S.W.2d 453, 469 (Tex.App. San Antonio 1993)(defining "mental anguish") with Qualicare of East Texas, Inc. v. Runnels, 863 S.W.2d 220, 222 (Tex.App. Eastland 1993).  Thus,

---

[8]The losing defendants cite a number of Texas Supreme Court cases for the proposition that the two terms are synonymous.  These cases, however, merely mention the availability of mental anguish *damages* for the *tort* of infliction of emotional distress.  See, e.g., City of Tyler v. Likes, 962 S.W.2d 489, 498 n.2 (Tex. 1997); Motor Express, Inc. v. Rodriquez, 925 S.W.2d 638, 639 (Tex. 1996); Boyles v. Kerr, 855 S.W.2d 593, 597 (Tex. 1993).  For that reason, we do not deem the case law as settled as the defendants seem to believe, at least for the purpose of applying the plain error rule here.

24

even if the jury charge were incorrect, it would not have been "obviously incorrect."

(b)

(I)

We do, however, agree with the losing defendants' second argument, that the instructions were plainly erroneous in allowing for multiple recovery for the same injuries. The special verdict form was an obviously incorrect statement of the law that was probably responsible for an incorrect verdict leading to substantial injustice.

(ii)

To determine whether the special verdict form was incorrect, we begin by examining the verdict form itself. That form set out the different causes of action in separate sections.[9] Within each section were two questions. The first listed the individual defendant and asked which ones had committed the tort. The second question then asked the jury to determine how much money would compensate the Tompkinses for damages resulting from that particular tort.

As part of that second question, the form listed four types of injuries: past mental anguish, future mental anguish, past

---

[9]There were sections for intentional infliction of emotional distress, tortious interference with contract, invasion of privacy, civil conspiracy, and RICO violations. The jury, however, only awarded damages for the invasion of privacy and intentional infliction of emotional distress claims. It also awarded exemplary damages.

25

emotional distress, and future emotional distress. After each type was space for the jury to enter an amount with respect to that particular injury. This was true for both the intentional infliction and invasion of privacy sections. But there was nothing, either in the general instructions or within any of the individual sections of the verdict form, that explained that the Tompkinses were not entitled to recover twice for the same injuries--the emotional distress and mental anguish--even though each of these same injuries appeared under more than one tort.

Thus, the form provided double recovery for the harm arising from any conduct that qualified as both an invasion of privacy and as an intentional infliction of emotional distress. The targeted picketing, just as an example, might have qualified under either tort, and the resulting harm would have been calculated twice.

This verdict form and the instructions were obviously incorrect. Under Texas law, plaintiffs are not entitled to more than one recovery for the same injury. <u>Stewart Title Guar. Co. v. Sterling</u>, 822 S.W.2d 1, 7 (Tex. 1991). This principle, called the "one-satisfaction rule," applies when defendants commit the same or differing acts that result in a single injury. <u>Id.</u> In allowing recovery for mental anguish and emotional distress under two separate causes of action, the special verdict form was obviously erroneous.

(iii)

26

This erroneous verdict form probably led to an incorrect verdict. The Tompkinses made no attempt at trial to distinguish between the harm resulting from the invasion of privacy and the harm caused by the intentional infliction tort. Given the presentation of the evidence at trial, it is unlikely that the jury could have separated harm arising from the intentional inflictions of emotional distress and the invasions of privacy, especially since the jury would have undertaken to do so without any direction from the court. For that reason, the verdict was, in all probability, duplicative. This conclusion accords with Texas law, which has established that failure to distinguish the mental anguish and emotional distress attributable to different claims are presumed to be the same single injuries. See Swink v. Alesi, 999 S.W.2d 107, 111 (Tex.App. Houston 1999)(plaintiff's failure to offer evidence of distinct losses due to second claim indicated there was a single injury); Bradford v. Vento, 997 S.W.2d 713, 735-36 (Tex.App. Corpus Christi 1999)(holding that recovery for mental anguish from various torts arising from same general set of incidents constituted a single injury); Berry Property Management, Inc. v. Bliskey, 850 S.W.2d 644, 666 (Tex.App. Corpus Christi 1993)(finding that plaintiff's inability to distinguish harm resulting from different causes of action indicated that there was only a single injury).

The Tompkinses respond by pointing out that the jury awarded different amounts for intentional infliction of emotional distress

27

and for invasion of privacy, suggesting that the harm for each tort was separate and distinct.[10]   But the Texas courts reviewing verdicts like this one have held that awards of differing amounts for the same type of damages under different causes of action do not prevent application of the one-satisfaction rule if the plaintiffs suffered only one injury.  Household Credit Services, Inc. v. Driscol, 989 S.W.2d 72, 80-82 (Tex.App. El Paso 1998); Bradford, 997 S.W.2d at 735; Bliskey, 850 S.W.2d at 666.  As already discussed, the plaintiffs demonstrated only single injuries here.

That the jury awarded two different amounts perhaps indicates that it did not find each and every activity that qualified as an intentional infliction of emotional distress also qualified as an invasion of privacy.  But there was, in all likelihood, a great deal of overlap between the two theories of recovery, since most of the activities qualifying for one would qualify for the other.

(iv)

The incorrect verdict was substantially unjust because of the amount involved.  The jury awarded damages for both intentional infliction of emotional distress and invasion of privacy.  The amount of damages for the injuries of past and future mental anguish was $1.5 million for the intentional infliction of

---

[10]As already mentioned, the jury awarded $2,248,000 for the intentional infliction of emotional distress and $2,800,0000 for the invasion of privacy.

28

emotional distress and $2 million for the invasion of privacy. The respective amounts for emotional distress were $750,000 and $800,000.

The amount that the Tompkinses incorrectly recovered twice was probably close to the full $2,248,000 for intentional infliction of emotional distress because the activities falling under that theory also probably qualified for an invasion of privacy. We find an incorrect award of approximately $2 million to be substantially unjust, and conclude that the instructions, in this respect, constituted plain error, requiring reversal. See Bender, 78 F.3d at 795 (finding double recovery of $300,700 constitutes a plainly-erroneous award); Conich v. Wayne County Community College, 874 F.2d 359, 369 (6th Cir. 1989)(finding $375,000 in actual damages excessive and plainly erroneous).

(v)

Thus, we are presented with the question of how to best remedy the unjust result of this plainly-erroneous instruction. Texas courts have a straightforward way of implementing the one-satisfaction rule with different damage awards for more than one cause of action based on the same harm. The courts simply treat these cases as failures by the plaintiff to elect a single theory of recovery from several alternative theories and use the jury findings affording the greater recovery. Birchfield v. Texarkana Mem'l Hosp., 747 S.W.2d 361, 367 (Tex. 1987); Driscol, 989 S.W.2d at 80-82; Bradford, 997 S.W.2d at 735. We believe that is the best

29

course of action here, and therefore vacate the intentional infliction award and affirm the invasion of privacy award. Our decision, however, only affects the losing defendants who have appealed and does not vacate the damage award against the non-appealing defendants. See Walker v. U.S. Dept. Of Housing and Urban Development, 99 F.3d 761, 774 n.18 (5th Cir 1996).[11]

## VII

The winning defendants have appealed the district court's denial of their motion for sanctions against the Tompkinses. That motion sought sanctions under both Texas Rule of Civil Procedure 13 and Federal Rule of Civil Procedure 11. With respect to Rule 13 sanctions, the winning defendants allege the claims filed in state court against them were frivolous and not investigated properly before making them defendants in this action. These defendants also assert that Rule 11 sanctions became available when the Tompkinses' counsel signed the pretrial order, thus, making the same frivolous claims in district court. We will review the district court's denial for abuse of discretion. Thornton v. General Motors Corp., 136 F.3d 450, 455 (5th Cir. 1998); New York Underwriters Ins. Co. v. State Farm, 856 S.W.2d 194, 205 (Tex. App. Dallas 1993).

---

[11]This does not affect the jury determination on exemplary damages. Where the jury has found the defendants engaged in two different tortious acts, it may award damages beyond actual damages for each of those two acts. Bliskey, 850 S.W.2d at 665. The losing defendants have not appealed the exemplary damages as a separate issue.

A

The district court was correct, in this case removed from state court, to consider the applicability of sanctions under Texas Rule of Civil Procedure 13 for the filing made in the Texas court. Although we have never explicitly addressed this issue, other federal courts have applied state sanctions rules to pleadings filed in state court before removal. See, e.g., Griffen v. City of Oklahoma City, 3 F.3d 336, 341 (10th Cir. 1993); Harrison v. Luse, 706 F.Supp. 1394, 1401 (D.Col. 1991); Schmitz v. Campbell-Mithun, Inc., 124 F.R.D. 189, 192 (N.D. Ill. 1989). We believe that this is appropriate. The federal rules do not apply to filings in state court, even if the case is later removed to federal court. Griffen, 3 F.3d at 341. If the state pleading rules did not apply, then nothing would govern the original pleadings in these cases, and a party who filed in bad faith might escape any penalty. Id. In addition, there is no concern in these situations that a court will be forced to choose between two conflicting sets of procedural rules. Id.

The district court was also correct to deny sanctions for the filings made in state court, because the winning defendants did not meet the requirements of Texas Rule of Civil Procedure 13. Before imposing sanctions under that rule, a court must determine that the pleading was groundless, and that the pleading was brought either

31

in bad faith or for the purpose of harassment. Tex. R. Civ. P. 13.[12]

First, the Tompkinses had grounds for their complaint, both legal and factual. The RICO claim was not legally frivolous in the light of the cases applying RICO law to protestors. See National Organization for Women, Inc. v. Scheidler, 510 U.S. 249 (1994)(abortion protestors); Palmetto State Medical Center, Inc. v. Operation Lifeline, 117 F.3d 142 (4th Cir. 1997)(same). In addition, the Tompkinses had conducted a factual investigation before joining the individual defendants. This investigation included taking depositions, reviewing a press release, hiring a private investigator, examining photographs and videotapes of the demonstrations, and checking license plate numbers of cars parked in the Tompkinses' neighborhood.

Second, the winning defendants do not appear to have presented any evidence of bad faith or an intent to harass. On the other hand, however, there is a presumption that pleadings are filed in good faith that the movant must overcome. GTE Communications Sys.

---

[12]The relevant portion of the rule reads:

    The signatures of attorneys or parties constitute a certificate by them that . . . to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. . . . If a pleading, motion or other paper is signed in violation of this rule, the court . . . shall impose an appropriate sanction.

<u>Corp. v. Tanner</u>, 856 S.W.2d 725, 731 (Tex. 1993). The winning defendants failed to do this.

For these two reasons, we will not reverse the district court's denial of Rule 13 sanctions.

B

With respect to the filings in federal court, the winning defendants also failed to establish two of the prerequisites for Rule 11 sanctions. First, sanctions may only be imposed if the offending party has notice and a "reasonable opportunity to respond." Fed. R. Civ. P. 11(c). Second, a motion for sanctions "shall not be filed with or presented to the court unless, within 21 days after service of the motion . . . , the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." <u>Id.</u> In this case, the winning defendants did not file their Rule 11 motion until after trial had concluded, thereby denying the Tompkinses a reasonable opportunity to correct their complaint. Additionally, the winning defendants served opposing counsel either the day they filed their sanctions motion or shortly before. Thus, they failed to comply with the twenty-one-day rule. For both of these reasons, the district court's denial of Rule 11 sanctions was appropriate.

VIII

We sum up. None of the evidentiary rulings constitute reversible error. The evidence here fully supports liability against the losing defendants for invasion of privacy and

intentional infliction of emotional distress. The amount of the jury award does not qualify as excessive, nor is the award duplicative in returning damages for both emotional distress and mental anguish. However, we hold that the award is duplicative in granting damages for the same single injury under both causes of action, intentional infliction of emotional distress and invasion of privacy. Consequently, we REVERSE and VACATE the jury award for intentional infliction of emotional distress and AFFIRM the award for invasion of privacy. Finally, we AFFIRM the denial of sanctions against the Tompkinses under both Federal Rule 11 and Texas Rule 13. The case is therefore REMANDED for entry of judgment not inconsistent with this opinion.

AFFIRMED in part, REVERSED and VACATED in part, and
REMANDED for entry of judgment.